DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036-6797
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
H. Jeffrey Schwartz
Gary J. Mennitt
Jonathan D. Perry

KLESTADT & WINTERS, LLP
292 Madison Avenue, 17th Floor
New York, New York  10017-6314
Telephone:  (212) 972-3000
Facsimile:  (212) 972-2245
Tracy L. Klestadt
Brendan M. Scott

*Hearing Date & Time: April 20, 2009 at 9:40 A.M.*
*Objection Deadline: April 15, 2009 at 5:00 P.M.*

*Attorneys for the Plaintiffs/Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BAYOU GROUP, LLC, et al., | : | Case No.:  06-22306 (ASH) |
| | : | |
| Debtors. | : | Jointly Administered |

----------------------------------------------------------------- X

| | |
|---|---|
| Bayou No Leverage Fund, LLC v. Peter Haje IRA and Peter Haje | 06-08430 |
| Bayou Superfund, LLC v. KFI Capital Partners LLC | 06-08337 |
| Bayou Superfund, LLC v. YK Investment Partnership II | 06-08341 |
| Bayou Superfund, LLC v. Helen Yulman Revocable Trust | 06-08332 |
| Bayou No Leverage Fund, LLC v. Mayer and Morris Kaplan Foundation | 06-08340 |
| Bayou No Leverage Fund, LLC v. Fred Montesi IRA et al. | 06-08329 |
| Bayou Superfund, LLC v. Mary Jane Pidgeon Sledge | 06-08339 |
| Bayou Superfund, LLC v. Highgate Partners LP | 06-08412 |
| Bayou No Leverage Fund, LLC v. DW Resources Defined Benefit Plan and Marc Daniels | 06-08415 |
| Bayou Superfund, LLC v. Alan Osofsky | 06-08398 |
| Bayou Superfund, LLC v. Randall M. and Sheryl B. Rothstein | 06-08389 |
| Bayou No Leverage Fund, LLC v. Marc Fleisher IRA et al. | 06-08423 |
| Bayou Superfund, LLC v. Kevin Bass | 06-08431 |
| Bayou Superfund, LLC v. Michael Davidson | 06-08435 |
| Bayou Superfund, LLC v. Neil Cohen | 07-08245 |
| Bayou Accredited Fund, LLC v. Edward Sorkin and Virginia Sorkin | 07-08246 |
| Bayou Superfund, LLC v. William Strang | 06-08387 |
| Bayou Superfund, LLC v. Myrna Bennett | 06-08420 |
| Bayou No Leverage Fund, LLC v. John Barr III IRA and John Barr III | 07-08244 |
| Bayou Accredited Fund, LLC v. Madison Capital Advisors Ltd. | 06-08403 |
| Bayou Superfund, LLC v. DB Structured Products, Inc. | 06-08494 |
| Bayou Superfund, LLC v. High Sierra Investments | 07-08243 |
| Bayou Superfund, LLC v. Michael Mann | 06-08419 |
| Bayou Management, LLC v. Altegris Investments, Inc. | 08-08294 |

**MOTION OF THE PLAINTIFFS/DEBTORS AND DEBTORS-IN-POSSESSION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AN ORDER AUTHORIZING AND APPROVING SETTLEMENT AGREEMENTS WITH DEFENDANTS IN TWENTY-FOUR ADVERSARY PROCEEDINGS**

Bayou Group, LLC ("Bayou Group"), Bayou Management, LLC ("Bayou Management"), Bayou Advisors, LLC ("Bayou Advisors"), Bayou Equities, LLC ("Bayou Equities"), Bayou Fund, LLC ("Bayou Fund"), Bayou Superfund, LLC ("Bayou Superfund"), Bayou No Leverage Fund, LLC ("Bayou No Leverage Fund"), Bayou Affiliates Fund, LLC ("Bayou Affiliates Fund"), and Bayou Accredited Fund, LLC ("Bayou Accredited Fund," and together with Bayou Fund, Bayou Superfund, Bayou No Leverage Fund, and Bayou Affiliates Fund, the "Bayou Hedge Funds") (collectively, the "Bayou Entities" or the "Debtors"), by and through their counsel, Dechert LLP and Klestadt & Winters, LLP, submit this motion (the "Motion")[1] for entry of an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving separate settlement agreements (collectively, the "Settlement Agreements"), by and between the Debtors and each of the following 24 settling adversary proceeding defendants (the "Settling Adversary Proceeding Defendants"):

- Peter Haje IRA and Peter Haje (Exhibit A);

- KFI Capital Partners LLC (Exhibit B)

- YK Investment Partnership II (Exhibit C)

- Helen Yulman Revocable Trust (Exhibit D)

- Mayer & Morris Kaplan Foundation (Exhibit E)

- Fred Montesi IRA and Fred Montesi (Exhibit F);

- Mary Jane Pidgeon Sledge (Exhibit G);

---

[1] The factual and legal assertions herein are solely those of the Debtors. The Settling Adversary Proceeding Defendants' support of the approval of the Settlement Agreements shall not be deemed their concurrence with the Debtors' recitations on these matters.

- Highgate Partners, LP (Exhibit H)

- DW Resources Defined Benefit Plan and Marc Daniels (Exhibit I);

- Alan Osofsky (Exhibit J);

- Randall M. Rothstein and Sheryl B. Rothstein (Exhibit K);

- Marc Fleisher IRA and Marc Fleisher (Exhibit L);

- Kevin Bass (Exhibit M);

- Michael Davidson (Exhibit N);

- Neil D. Cohen (Exhibit O);

- Edward Sorkin and Virginia Sorkin (Exhibit P);

- William Strang (Exhibit Q

- Myrna Bennett (Exhibit R);

- John Barr III IRA and John Barr III (Exhibit S);

- Madison Capital Advisors Ltd. (Exhibit T);

- DB Structured Products, Inc. (Exhibit U);

- High Sierra Investments (Exhibit V);

- Michael Mann (Exhibit W); and

- Altegris Investments, Inc. (Exhibit X)

In support of the Motion,[2] the Debtors respectfully represent as follows:

---

[2] This Motion shall constitute a separate motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure in each of the above-captioned adversary proceedings on a several as well as joint basis.

## PRELIMINARY STATEMENT

1.     The Debtors have entered into Settlement Agreements to resolve 24 adversary proceedings commenced by the Debtors, including 23 adversary proceedings against redeeming investors in the Bayou Hedge Funds (the "Settling Redeemer Defendants") and one adversary proceeding against an investment intermediary, Altegris Investments, Inc.  Each of the 23 adversary proceedings against the Settling Redeemer Defendants was covered by this Court's Decisions on Cross-Motions for Summary Judgment dated October 16, 2008 (the "Summary Judgment Decision"), 396 B.R. 810 (Bankr. S.D.N.Y. 2008).  The Debtors have concluded that each of the Settlement Agreements with the Settling Redeemer Defendants serves the best interests of the Debtors' estates in light of the Summary Judgment Decision, the economic benefit to the estates from the defendant's agreement to waive all further claims against the estates, including their claims arising under section 502(h) of the Bankruptcy Code, and the costs and benefits of litigating these adversary proceedings further, either in trials or on appeal before the United States District Court.

2.     The key terms of the Settlement Agreement entered into with Altegris Investments, Inc. are described below in paragraph 75-81.  The key terms of the Settlement Agreements in the 23 adversary proceedings against the Settling Redeemer Defendants, which will result in an aggregate recovery by the Debtors of $5,547,179, are described below in paragraphs 31-74, and summarized as follows:

| Defendant Name | Adv. Proc. No. | Total Settlement Amount | % of Principal To Pay | % of Profits To Pay | Other Notable Terms |
|---|---|---|---|---|---|
| Peter Haje IRA and Peter Haje | 06-08430 | $521,101.00 | 82% | 100% | Waive claims against estate; Retain claim against government restitution fund |
| KFI Capital Partners LLC | 06-08337 | $356,747.00 | 75% | 100% | Waives claims against estate; Retains claim against government restitution fund; % of principal paid may be reduced based on related settlements prior to July 31, 2009 |
| YK Investment Partnership II | 06-08341 | $863,163.00 | 75% | 100% | Waives claims against estate; Retains claim against government restitution fund; % of principal paid may be reduced based on related settlements prior to July 31, 2009 |
| Helen Yulman Revocable Trust | 06-08332 | $367,564.00 | 75% | 100% | Waives claims against estate; Retains claim against government restitution fund; % of principal paid may be reduced based on related settlements prior to July 31, 2009 |
| Mayer & Morris Kaplan Foundation | 06-08340 | $572,306.00 | 75% | 100% | Waives claims against estate; Retains claim against government restitution fund; % of principal paid may be reduced based on related settlements prior to July 31, 2009 |
| Fred Montesi IRA and Fred Montesi | 06-08329 | $96,916.00 | 56.5% | 100% | Waive claims against estate; Retain claim against government restitution fund |
| Mary Jane Pidgeon Sledge | 06-08339 | $575,001.00 | 38% | 100% | Waives claims against estate; Retains claim against government restitution fund |
| Highgate Partners, LP | 06-08412 | $454,100.00 | 38% | 100% | Waives claims against estate; Retains claim against government restitution fund |

| | | | | | |
|---|---|---|---|---|---|
| DW Resources Defined Benefit Plan and Marc Daniels | 06-08415 | $98,679.00 | 10% | 100% | Waive claims against estate; Retain claim against government restitution fund |
| Alan Osofsky | 06-08398 | $95,015.00 | 10% | 100% | Waives claims against estate; Retains claim against government restitution fund |
| Randall M. and Sheryl B. Rothstein | 06-08389 | $95,015.00 | 10% | 100% | Waive claims against estate; Retain claim against government restitution fund |
| Marc Fleisher IRA and Marc Fleisher | 06-08423 | $98,500.00 | 10% | 100% | Waive claims against estate; Retain claim against government restitution fund |
| Kevin Bass | 06-08431 | $87,947.00 | 10% | 100% | Waives claims against estate; Retains claim against government restitution fund |
| Michael Davidson | 06-08435 | $95,016.00 | 10% | 100% | Waives claims against estate; Retains claim against government restitution fund |
| Neil D. Cohen | 07-08245 | $150,772.00 | 10% | 100% | Waives claims against estate; Retains claim against government restitution fund |
| Edward and Virginia Sorkin | 07-08246 | $96,617.00 | 10% | 100% | Waive claims against estate; Retain claim against government restitution fund |
| Myrna Bennett | 06-08420 | $102,700.00 | 0% | 100% | Waives claims against estate |
| John Barr III IRA and John Barr III | 07-08244 | $84,334.00 | 0% | 100% | Waive claims against estate |
| Madison Capital Advisors Ltd. | 06-08403 | $306,486.00 | 0% | 96% | Waives claims against estate |
| DB Structured Products, Inc. | 06-08494 | $429,200.00 | 0% | 100% | Retains claims against estate on second, non-redeemed account; claim adjusted to reflect 100% of principal |
| High Sierra Investments | 07-08423 | $0 | 0% | 0% | Partial redeemer; waives all claims against estate for non-redeemed principal of $1.7 million |
| Michael Mann | 06-08419 | $0 | 0% | 0% | Partial redeemer; waives all claims against estate for $46,100 of non-redeemed principal of $46,100 |

## FACTS

**A.    The Debtors Were Fraudulently Operated Pre-Petition**

3.    The Debtors are an affiliated group of entities that created, operated, comprised, and controlled private pooled investment funds.  The Debtors were operated as a massive fraudulent investment scheme that induced investments of hundreds of millions of dollars into the Bayou Hedge Funds.

**B.    The Criminal Prosecution of the Debtors' Pre-Petition Principals and the Government Distribution of Forfeited Assets to Bayou Investors**

4.    The Debtors' three pre-Petition principals – Samuel Israel III, Daniel E. Marino, and James Marquez – have pleaded guilty in the United States District Court for the Southern District of New York to conspiring to defraud investors in connection with the operations of the Bayou Hedge Funds.  Israel and Marino further pleaded guilty in this District to federal counts of mail and wire fraud, investment advisor fraud, and conspiracy to commit fraud, in connection with their operation of the Bayou Hedge Funds.  The Debtors' pre-petition principals have all been sentenced, orders of restitution have been entered against them, and each is currently incarcerated.

5.    In connection with the guilty pleas of Israel, Marino, and Marquez, the District Court entered preliminary orders of forfeiture (the "Forfeiture Orders"), which required Israel, Marino, and Marquez to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all real and personal property that constituted or was derived from the proceeds traceable to the commission of the offenses set forth in the indictment (the "Forfeited Assets").

6.    The United States has liquidated certain of the Forfeited Assets into a restitution fund (the "Government Restitution Fund").  The Debtors' understanding is that, beginning in July 2008, the United States has made distributions, equal to approximately 28% of investment

principal, to victims of the Pre-Petition Bayou Fraud from the Government Restitution Fund. The Debtors further understand that, in addition, a reserve was established within the Government Restitution Fund for the benefit of contingent victims, such as adversary proceeding defendants who return investment principal to the Debtors' estates.

**C.    The Unofficial Committee was Formed to Mitigate Massive**
**Losses by Setting up the Pursuit of Claims Against Third Parties**

7.    In February 2006, following broad notice to creditors of the Bayou Hedge Funds, more than sixty creditors of the Debtors holding in excess of $130 million in claims organized the Unofficial On-Shore Creditors Committee (the "Unofficial Committee").  The primary purpose of the Unofficial Committee was to mitigate its constituency's massive financial losses as expeditiously and efficiently as practicable.  Among other things, the Unofficial Committee sought an official, independent, disinterested fiduciary to manage the Debtors so that the Debtors could initiate and maintain Chapter 11 cases to liquidate Chapter 5 claims and other choses in action outside the scope of the Government Receiver's charge for the benefit of all defrauded creditors.

**D.    The District Court Grants Requested Relief and**
**Appoints Marwil as Managing Member of the Bayou Entities**

8.    The Unofficial Committee filed a civil action with the District Court seeking the appointment of Jeff J. Marwil ("Marwil") as a fiduciary of the Debtors to marshal and prosecute the avoidance power claims in favor of the defrauded creditors community so as to efficiently mitigate their losses.  Complaint, Unofficial On-Shore Creditors' Committee v. Bayou Group, LLC, 06-cv-2379, subsequently consolidated with In re Bayou, 06 MDL 1755; see Order of Consolidation entered April 21, 2006.  Broad notice of the case commencement was given to all known creditors of the Debtors, parties-in-interest therein, and the United States.

9.     At hearings before the District Court on April 18, 2006, and April 28, 2006,

attended by, <u>inter</u> <u>alia</u>, the U.S. Attorney (both criminal and civil divisions), the SEC, and the

CFTC, the Unofficial Committee advocated for the appointment of Marwil as, <u>inter</u> <u>alia</u>,

managing member of each of the Debtors to launch and navigate through conclusion insolvency

proceedings for each of the Debtors.

10.     Immediately following the April 28, 2006 hearing, the District Court entered an

Order (the "District Court Order") pursuant to 28 U.S.C. §§ 754 and 959, Federal Rule of Civil

Procedure 66, and the Court's inherent authority, appointing Marwil:

> the sole and exclusive managing member and representative of each of the Bayou Entities with the sole and exclusive power and authority to manage and direct the business and financial affairs of the Bayou Entities, including without limitation, the authority to petition for protection under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), for any or all of the Bayou Entities and in connection therewith be and be deemed a debtor-in-possession for any or all of the Bayou Entities in proceedings under Chapter 11 of the Code, and prosecute such adversary proceedings and other matters as may be permitted under the Code and/or applicable law.

District Court Order ¶ 7(e).

11.     As managing member of each of the Debtors, Marwil analyzed the Debtors,

devised a litigation and business strategy, reviewed the financial and operational history of the

Debtors, managed the Debtors, and commenced these cases and adversary proceedings seeking

to mitigate investor losses.

**E.     The Bankruptcy Cases**

12.     On May 30, 2006 (the "Petition Date"), the Debtors filed with this Court separate

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to Bankruptcy

Rule 1015(b), the Debtors' cases have been procedurally consolidated and are being jointly

administered by this Court.  Under Marwil's control as managing member, the Debtors are

debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

13.     On June 15, 2006, the United States Trustee for Region 2 appointed the Official Unsecured Creditors' Committee (the "Committee") consisting of five members, four of whom were voting members of the Unofficial Committee, which, as set forth above, had previously successfully obtained the District Court Order appointing Marwil managing member of each of the Bayou Entities.

**F.     The Adversary Proceedings**

14.     Since the Petition Date, the Debtors have commenced 131 adversary proceedings against certain redeeming investors who received redemption payments from the Debtors within two years of the Petition Date.

15.     Subsequently, on February 29, 2008, the Debtors commenced an additional 47 adversary proceedings seeking the return of Purported Profits (see definition below) against certain redeeming investors who received at least one redemption payment from the Debtors between two and six years of the Petition Date.

16.     To date, the Debtors have obtained Bankruptcy Court approval of 89 separate settlement agreements resulting in the recovery by the Debtors of over $30,000,000.

**G.     The Adversary Proceedings Against the  Settling Redeemer Defendants**

17.     Each of the Settling Redeemer Defendants made investments in the Bayou Hedge Funds to acquire interests in those funds, as described in more detail below.  Prior to the Petition Date, each of the Settling Redeemer Defendants received transfers (the "Redemption Payments") from the Bayou Hedge Funds, also as described further below.  Most of the Redemption Payments consisted of an amount equal to the Settling Redeemer Defendant's principal investment plus purported appreciation on that investment (the "Purported Profits").

18.     The complaints against the Settling Redeemer Defendants assert the following claims under federal and New York state law:  (1) actual fraudulent conveyance pursuant to Bankruptcy Code § 548(a)(1)(A) and section 276 of the New York Debtor and Creditor Law; and (2) constructive fraudulent conveyance pursuant to Bankruptcy Code § 548(a)(1)(B) and sections 273-275 of the New York Debtor and Creditor Law.

19.     Section 548(a)(1)(A) of the Bankruptcy Code establishes a cause of action in favor of a debtor for actual fraudulent conveyance.  Under section 548(a)(1)(A), a debtor "may avoid any transfer" made by the debtor with "actual intent to hinder, delay, or defraud" existing or future creditors.  11 U.S.C. § 548(a)(1)(A).  Only the fraudulent intent of the transferor, and not the transferee, is relevant under section 548(a)(1)(A).  The remedy under section 548(a)(1)(A) is avoidance and recovery of the entirety of the transfer, including redemption payments consisting of an investor's principal investments and any fictitious profits.  As discussed below, a debtor's remedy under section 548(a)(1)(A) is subject to an affirmative defense afforded a transferee under section 548(c).

20.     Section 548(a)(1)(B) of the Bankruptcy Code establishes a cause of action in favor of a debtor for constructive fraudulent conveyance.  Under section 548(a)(1)(B), a debtor may avoid a transfer for which a debtor "received less than a reasonably equivalent value in exchange" and which was made when the debtor was insolvent.  11 U.S.C. § 548(a)(1)(B).  In the context of a fraudulent investment scheme like the one at issue in this case, a debtor is deemed to have received "reasonably equivalent value" only for redemption payments up to the amount of the transferee's principal investment, but not for any distributions of fictitious profits.

21.     Once a debtor satisfies its *prima facie* case under section 548(a)(1)(A) of the

Bankruptcy Code, the burden shifts to the transferee to establish its potential affirmative defense

under section 548(c) of the Bankruptcy Code, which requires such transferee to prove that it took

the fraudulent transfer both for "value" and in "good faith."  11 U.S.C. § 548(c).  The concept of

"good faith" under section 548(c) does not turn on the transferee's intent, complicity or state of

mind, but rather on whether the transferee was on "inquiry notice" of possible infirmity with its

investment at the time it requested redemption.

22.     On October 16, 2008, the Bankruptcy Court issued the Summary Judgment

Decision.  In that Decision, the Bankruptcy Court held that the debtor Plaintiffs satisfied their

*prima facie* under section 548(a)(1)(A) of the Bankruptcy Code in each of the adversary

proceedings, *i.e.*, the Plaintiffs proved that that the Bayou Hedge Funds made each of the

redemption payments to the defendants with actual intent to hinder, delay or defraud the Bayou

Hedge Funds' investor creditors.

23.     In the Summary Judgment Decision, the Bankruptcy Court articulated the "good

faith" standard as follows:

> Thus, it is important for the trier of fact to understand that the test for
> good faith under Section 548(c) is not whether the defendant was
> guilty of any sort of bad faith in requesting and receiving the transfer.
> The test is whether the defendant requested redemption after learning
> of a "red flag" which, under an "objective" standard, should have put
> the defendant on "inquiry notice" of some infirmity in Bayou or the
> integrity of its management.  The rule does not require that the "red
> flag" be of such specificity as to put the recipient on 'inquiry notice' of
> the actual fraud, or embezzlement, or looting, or whatever ultimately
> proves to be the cause of loss.  It is sufficient if the red flag puts the
> investor on notice of some potential infirmity in the investment such
> that a reasonable investor would recognize the need to conduct some
> investigation.  The 'diligent investigation' is required not because of
> any duty to inquire owed to a third party.  It is required only to prove
> the plausibility of the defendant's asserted good faith reason for
> redemption independent of the red flag, notwithstanding [] knowledge

> of the red flag, by showing that the facts learned upon inquiry
> reasonably allayed any concern raised by the red flag.

396 B.R. at 848. The Bankruptcy Court added that, although the standard for "good faith" rests

principally on whether the defendant was objectively on inquiry notice:

> a defendant may establish his defense if he can prove by a
> preponderance of the credible objective evidence that his request
> for redemption was in fact the result of a good faith reason other
> than his knowledge of 'red flags," even if he was on inquiry notice
> and did not make inquiry before redeeming. By 'objective
> evidence' I mean independent evidence of facts, as opposed to
> mere 'subjective assertions of good faith' by the defendant himself
> or the testimony of others that cannot be objectively verified.

Id. at 849.

24. With respect to 15 of the adversary proceeding defendants, the Bankruptcy Court

held that those defendants could not satisfy their respective good faith defense under section

548(c) of the Bankruptcy Code as a matter of law, and therefore awarded Plaintiffs summary

judgment on their claims to recover the entirety of the redemption payments made to these

defendants, including amounts equal to the defendants' investment principal and Purported

Profits. With respect to 12 of the adversary proceeding defendants, the Bankruptcy Court held

that there was an issue of fact with respect to these defendants' good faith defenses under section

548(c) of the Bankruptcy Code, thereby requiring a trial on certain issues relating to the good

faith defense. The Bankruptcy Court held that three of the defendants met their good faith

defenses as a matter of law, and therefore granted summary judgment to those defendants with

respect to claims to recover redemption payments equal to the defendant's principal investment.

Lastly, the good faith of three of the defendants was not at issue on the summary judgment

motions.

25.     In the Summary Judgment Decision, the Bankruptcy Court also held that all of the redemption payments of Purported Profits made to the adversary proceeding defendants were constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

26.     In particular, the Bankruptcy Court resolved the Debtors' and the defendants' cross-motions for summary judgment as follows: (a) with respect to defendants Redwood Growth Partners, L.P., Heritage Hedged Equity Fund, LP, D. Canale Beverages, Inc., John D. Canale III, Mary P. Smythe Residuary Trust, Marvin E. Bruce Living Trust, KFI Capital Partners LLC, YK Investment Partnership II, Helen Yulman Revocable Trust, Mayer & Morris Kaplan Foundation, Christian Brothers H.S. Endowment, Fred Montesi IRA & Fred Montesi, H&B Hedge Fund II LLC, Freestone Low Volatility Partners LP, and Peter Haje IRA & Peter Haje, the Court awarded summary judgment in favor of the Debtors on their first and second claims for relief avoiding and recovering the full amount of the transfers, including principal invested and Purported Profits, totaling $30,927,025, under 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), and 550, dismissing the individual affirmative defenses of the defendants under 11 U.S.C. § 548(c), and denying the defendants' cross-motions for summary judgment; (b) with respect to defendants Mary Jane Pidgeon Sledge, the Sterling Funds, Highgate Partners LP, William Strang, Randall M. & Sheryl B. Rothstein, Alan Osofsky, DW Resources DBP & Marc Daniels, Marc Fleisher IRA & Marc Fleisher, Kevin Bass, Michael Davidson, Neil D. Cohen, and Edward & Virginia Sorkin, awarding summary judgment in favor of the Debtors on their first and second claims for relief under 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), and 550, entitling the Debtors to avoidance and recovery of the transfers of Purported Profits totaling $1,475,817, and directing that the cases be referred to the district court for jury trials with respect to these defendants' individual affirmative defenses under 11 U.S.C. § 548(c); (c) with respect to DB Structured Products, Inc.,

Myrna Bennett, Madison Capital Advisors, and John Barr II & John Barr IRA, awarding summary judgment in favor of the Debtors on their first and second claims under 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), and 550, entitling the Debtors to avoidance and recovery of the transfers of Purported Profits totaling $102,700; and (d) with respect to Michael Mann and High Sierra Investments, awarding summary judgment in favor of these defendants.

27.    During a hearing held on December 18, 2008, the Bankruptcy Court denied Plaintiffs' requests for awards of pre-judgment interest against those defendants ordered to return money to the Debtors' estates.

28.    On January 29, 2009, the Bankruptcy Court entered final orders in each of the adversary proceedings reflecting and implementing the Summary Judgment Decision.

29.    On February 9, 2009, the following adversary proceeding defendants, including certain of the Settling Redeemer Defendants, filed Notices of Appeal from the January 29, 2009 final orders:  Redwood Growth Partners, L.P., Heritage Hedged Equity Fund, LP, D. Canale Beverages, Inc., John D. Canale III, Mary P. Smythe Residuary Trust, Marvin E. Bruce Living Trust, KFI Capital Partners LLC, YK Investment Partnership II, Helen Yulman Revocable Trust, Mayer & Morris Kaplan Foundation, Christian Brothers H.S. Endowment, H&B Hedge Fund II LLC, Freestone Low Volatility Partners LP; Randall M. & Sheryl B. Rothstein, Marc Fleisher IRA & Marc Fleisher, Kevin Bass, Michael Davidson, Neil D. Cohen, and Edward & Virginia Sorkin.

30.     Highgate and the Sterling Stamos Funds (comprised of Sterling Stamos Security

Fund, L.P., Sterling Stamos Security Fund – Friends & Family, L.P., Sterling Stamos Growth

Fund, .LP, and Sterling Stamos Liquidity Fund, L.P.) filed motions for leave to appeal on

February 9, 2009.  On February 25, 2009, the Debtors filed its memorandum of law in answer

and opposition to the Sterling Funds' motion for leave to appeal.  On February 26, 2009, the

Bankruptcy Court entered a Stipulation and Order withdrawing Highgate's motion for leave to

appeal without prejudice to Highgate's right to re-file the motion for leave to appeal in the event

that this Motion is denied with respect to the Highgate Settlement Agreement.

**H.      Terms of the 23 Settlement Agreements with the Settling Redeemer Defendants**

31.     As a result of vigorous, arms-length, and good faith negotiations, the Debtors and

each of the Settling Redeemer Defendants reached agreements in principle to settle the

applicable Adversary Proceeding.  The terms of each settlement were subsequently memorialized

in the Settlement Agreements.  The Debtors have concluded that the proposed settlements, as

embodied in the Settlement Agreements, are in the best interests of the Debtors' estates, and, in

reaching that conclusion, have considered, among other things, the Bankruptcy Court's holding

in the Summary Judgment Decision, the relative merits of the defenses available to the settling

defendant at trial or on appeal, the Plaintiffs' ability to collect any judgment if successful in the

litigation, the opinion of the Committee, and the cost, expense, and delay associated with further

litigating the legal and factual issues implicated in the Adversary Proceedings in trials or on

appeal.

32.     In general, the key terms of the Settlement Agreements are as follows:

- With one limited exception (arising from issues relating to collection of the judgment from a fund that was dissolved significantly prior to the commencement of the adversary proceeding), the Settling Redeemer Defendants have agreed to pay the Debtors 100% of the portion of the redemption payments consisting of Purported Profits.

- Many of the Settling Redeemer Defendants have agreed to pay the Debtors between 10% and 82% of the portion of the redemption payments equal to their respective invested principal (the "Principal").

- All of the Settling Redeemer Defendants have agreed to waive all claims, including all claims under section 502(h) of the Bankruptcy Code, against the Debtors.

- Those Settling Redeemer Defendants who have agreed to repay a portion of Principal will retain any available claim against the Government Restitution Fund.

Any other terms particular to a Settling Defendant, as embodied in each Settlement Agreement, are further detailed below.[3]

### (1)      Peter Haje IRA and Peter Haje (Exhibit A)

33.      The Peter Haje IRA (the "Haje IRA") invested $500,000 in Bayou No Leverage Fund in or about June 2003.  The Haje IRA requested full redemption of its Bayou investment on December 3, 2004.  In or about January 2005, Bayou No Leverage made a redemption payment to the Haje IRA in the amount of $549,900.  In or about June 2005, Bayou No Leverage made an additional redemption payment to the Haje IRA in the amount of $60,926.  In total, the Haje IRA received redemption payments totaling an amount equal to 100% of its Principal and $110,826 in Purported Profits.

---

[3]      The descriptions of the Settlement Agreements in section H of this Motion are merely intended to serve as a summary of, and are qualified in their entirety by reference to, each of the Settlement Agreements.  These descriptions should not be used to resolve any issue of interpretation that could arise under any of the Settlement Agreements.  In addition, the summary contains the general applicable terms and may not be relevant to all of the Settling Adversary Proceeding Defendants.

34.     In its Summary Judgment Decision, the Court held that the Haje IRA had no basis to invoke the good faith defense under section 548(c) of the Bankruptcy Code. The Court concluded that "Haje was on objective 'inquiry notice' of some problem sufficiently 'wrong' with Bayou that would cause his long-time advisor on whom he relied to advise immediate redemption of his Bayou investment," and "he promptly acted on the basis of that knowledge to redeem his Bayou investment."

35.     As embodied in the Haje Settlement Agreement, once the Bankruptcy Court's order approving the Haje Settlement Agreements becomes final and non-appealable, Haje will return that portion of Redemption Payments equal to 82% of Principal and 100% of Purported Profits. The Settlement Agreement contains mutual releases of all claims against each other; accordingly, Haje waives all claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code. Haje retains all claims against the Government Restitution Fund.

**(2)     KFI Capital Partners LLC (Exhibit B)/
YK Investment Partnership II (Exhibit C)/
Helen Yulman Revocable Trust (Exhibit D)/
Mayer and Morris Kaplan Foundation (Exhibit E)**

36.     Adversary Proceeding Defendants KFI Capital Partners LLC ("KFI Capital"), YK Investment Partnership II ("YK"), Helen Yulman Revocable Trust ("Yulman Trust") and Mayer and Morris Kaplan Foundation (the "Kaplan Foundation") (collectively, the "KFI-Related Defendants") are all supervised by a family office called Kaplan Family Investments.

37.     KFI Capital invested a total of $400,000 in Bayou Superfund in or about July 2003 and October 2003. YK invested $1,000,000 in Bayou Superfund in or about October 2003. The Yulman Trust invested $450,000 in Bayou Superfund in or about January 2004. The Kaplan Foundation invested $600,000 in Bayou No Leverage Fund in or about March 2003. All four of

the KFI-Related Defendants requested full redemption of their respective Bayou investments on June 23, 2004. In or about August 2004, Bayou Superfund made redemption payments to KFI Capital in the amount of $408,000, YK in the amount of $994,400, and the Yulman Trust in the amount of $428,900, and Bayou No Leverage Fund made a redemption payment to the Kaplan Foundation in the amount of $645,200. In or about May 2005, Bayou Superfund made redemption payments to KFI in the amount of $48,747, YK in the amount of $118,763, and the Yulman Trust in the amount of $51,164, and Bayou No Leverage Fund made a redemption payment to the Kaplan Foundation in the amount of $77,106. In total, all four KFI-Related Defendants received redemption payments equal to 100% of their respective Principal; in addition, KFI Capital received $56,747 in Purported Profits, YK received $113,163 in Purported Profits, the Yulman Trust received $30,064 in Purported Profits, and the Kaplan Foundation received $122,306 in Purported Profits.

38. In its Summary Judgment Decision, the Bankruptcy Court held that the four KFI-Related Defendants had no basis to invoke the good faith defense under section 548(c) of the Bankruptcy Code. The Bankruptcy Court concluded that the KFI-Related Defendants offered no reason for their redemptions other than a recommendation by their investment advisor to redeem because of problems concerning the Bayou Hedge Funds.

39. As embodied in each of the Settlement Agreements with the KFI-Related Defendants, once the Bankruptcy Court's orders approving these Settlement Agreements become final and non-appealable, each of the KFI-Related Defendants will return that portion of their Redemption Payments equal to 75% of Principal and 100% of Purported Profits. The Settlement Agreements with the KFI-Related Defendants provide, however, that in the event that any of the Debtors enter into a settlement agreement with Redwood Growth Partners, L.P., Heritage

Hedged Equity Fund LP, D. Canale Beverages, Inc., John D. Canale III, Mary P. Smythe Residuary Trust, Marvin E. Bruce Living Trust, Christian Brothers High School Endowment, or H & B Hedge Fund II LLC (the "Other Relevant Defendants") that is (1) agreed to in principle by the Debtors and such Other Relevant Defendant on or before July 31, 2009, and (2) in which any of the Other Relevant Defendants is required to pay less than 75% of that portion of the Redemption Payment equal to the principal investment (a "Settlement Agreement with Other Relevant Defendant"), then the amount of the Settlement Payment shall be reduced to reflect the same lower percentage of principal as included in the Settlement Agreement with Other Relevant Defendant.  The Settlement Agreement also contains mutual releases of all claims against each other:  Each of these four defendants waives all claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code, and retains all claims against the Government Restitution Fund.

### (3) **Fred Montesi IRA and Fred Montesi (Exhibit F)**

40.    The Fred Montesi IRA (the "Montesi IRA") invested $103,652 in Bayou Fund in or about December 2001.  On or about February 6, 2003, the Bayou Fund was terminated during a corporate restructuring and the investment was transferred to Bayou No Leverage Fund.  The Montesi IRA requested full redemption of its Bayou investment on or about July 27, 2004.  In or about August 2004, Bayou No Leverage Fund made a redemption payment in the amount of $126,900.  In or about July 2005, Bayou No Leverage Fund made an additional redemption payment to the Montesi IRA in the amount of $15,105.  In total, the Montesi IRA received redemption payments equal to 100% of its Principal and $38,353 in Purported Profits.

41.     In its Summary Judgment Decision, the Court held that Montesi IRA had no basis to invoke the good faith defense under section 548(c) of the Bankruptcy Code because the Montesi IRA did not assert any reason for the redemption other than information it received from its investment intermediary, CSG, concerning problems with the Bayou Hedge Funds.

42.     On or about January 30, 2009, Montesi filed a Motion for Reconsideration of the Bankruptcy Court's Summary Judgment Decision, but the hearing on the motion has been adjourned (and is currently scheduled for April 14, 2009).  The parties subsequently entered into the Settlement Agreement.

43.     As embodied in the Montesi Settlement Agreement, once the Bankruptcy Court's order approving the Montesi Settlement Agreements becomes final and non-appealable, Montesi will return $96,916, which consists of that portion of Redemption Payments equal to 56.5% of Principal and 100% of Purported Profits.  The Settlement Agreement also contains mutual releases of all claims against each other; accordingly, the Montesi IRA and Montesi waive all claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code, while retaining all claims against the Government Restitution Fund.

### (4)     Mary Jane Pidgeon Sledge (Exhibit G)

44.     Mary Jane Pidgeon Sledge ("Sledge") invested a total of $900,000 in Bayou Superfund as of March 2003.  Sledge requested full redemption of her Bayou investment on or about June 28, 2004.  In or about August 2004, Bayou Superfund made a redemption payment to Sledge in the amount of $1,102,100.  In or about June 2005, Bayou Superfund made an additional redemption payment to Sledge in the amount of $120,901.  In total, Sledge received redemption payments equal to 100% of her Principal and $233,001 in Purported Profits.

45.     Plaintiff moved for summary judgment on Sledge's "good faith" defense under section 548(c) of the Bankruptcy Code.  Plaintiff contended that Sledge lacked "good faith" because she redeemed her Bayou investment based on a recommendation from her investment advisor.  Sledge denied having any knowledge of the red flags that caused her investment advisor to recommend redemption of its clients' Bayou investments, and Sledge's daughter testified that she decided in January 2004 to redeem her mother's investments in Bayou and other hedge funds at what she believed to be the next semi-annual redemption date.  The Bankruptcy Court denied Plaintiff's motion for summary judgment, holding that the "dispute of facts regarding Sledge's redemption requires a trial."  On January 29, 2009, the Bankruptcy Court entered an order referring the Sledge Adversary Proceeding to the U.S. District Court for a trial on Sledge's "good faith" defense.

46.     As embodied in the Sledge Settlement Agreement, once the Bankruptcy Court's order approving the Sledge Settlement Agreements becomes final and non-appealable, Sledge will return $575,001.00, consisting of that portion of the Redemption Payments equal to 38% of Principal and 100% of Purported Profits.  The Settlement Agreement also contains mutual releases of all claims against each other; accordingly, Sledge waives all claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code, while retaining all claims against the Government Restitution Fund.

### (5)     Highgate Partners, LP (Exhibit H)

47.     Highgate Partners, LP ("Highgate") invested $850,000 in Bayou Superfund in April 2003.  Highgate requested full redemption of its Bayou investment on or about February 11, 2005.  In or about March 2005, Bayou Superfund made a redemption payment to Highgate in the amount of $981,000, which was equal to 100% of Highgate's Principal and $131,100 in Purported Profits.

48.     Plaintiff and Highgate cross-moved for summary judgment on Highgate's "good faith" defense under section 548(c) of the Bankruptcy Code.  Plaintiff contended that Highgate lacked "good faith" because it redeemed its Bayou investment after attending a meeting between representatives of Sterling Stamos Capital Management and Sam Israel in which Israel was dismissive of and refused to answer certain questions asked by Sterling Stamos's General Counsel concerning a lawsuit filed against Sam Israel by a former principal of Bayou Management.  Highgate denied that its decision to redeem was motivated by any concern over that lawsuit or Israel's reaction to the questions posed by Sterling Stamos's General Counsel, but rather contended that its redemption decision was motivated by Israel's purported representation at the February 9 meeting that he would be undertaking certain strategic changes concerning the Bayou Hedge Funds.  The Bankruptcy Court denied Plaintiff's and Highgate's cross-motions for summary judgment, holding that there was an "issue of fact requiring a trial" on Highgate's good faith defense.

49.     On January 29, 2009, the Bankruptcy Court entered an order referring the Highgate Adversary Proceeding to the U.S. District Court for a trial on Highgate's "good faith" defense.  On February 9, 2009, Highgate filed a motion for leave to appeal from the Bankruptcy Court's January 29th order.  Plaintiff and Highgate subsequently entered into the Settlement Agreement, and Highgate agreed to withdraw its motion for leave to appeal without prejudice pending approval of the Settlement Agreement.

50.     As embodied in the Highgate Settlement Agreement, once the Bankruptcy Court's order approving the Highgate Settlement Agreements becomes final and non-appealable, Highgate will return $454,100.00, consisting of that portion of the Redemption Payment equal to 38% of Principal and 100% of Purported Profits.  The Settlement Agreement contains mutual

releases of all claims against each other; accordingly, Highgate waives all claims against the

Debtors, including all claims under section 502(h) of the Bankruptcy Code, while retaining all

claims against the Government Restitution Fund.

### (6) Nine Kra-Related Defendants (Exhibit I through Exhibit Q)

51.     Adversary Proceeding Defendants DW Resources Defined Benefit Plan and Marc

Daniels ("Daniels"); Alan Osofsky ("Osofsky"); Randall M. and Sheryl B. Rothstein (the

"Rothsteins"); Marc Fleisher IRA and Marc Fleisher ("Fleisher"); Kevin Bass ("Bass"), Michael

Davidson ("Davidson"); Neil D. Cohen ("Cohen"); Edward and Virginia Sorkin (the "Sorkins");

and William Strang ("Strang") (collectively, the "Nine Kra-Related Defendants") all invested in

the Bayou Hedge Funds arising out of a relationship with Howard Kra, a former Bayou salesman

who marketed the Bayou Hedge Funds to his friends and former brokerage clients.

52.     Six of the Nine Kra-Related Defendants – Osofsky, the Rothsteins, Fleisher, Bass,

Davidson, Cohen and Sorkin – each invested $250,000 in the Bayou Hedge Funds between

October 2002 and February 2004.  Daniels invested $250,451 in the Bayou Hedge Funds in

December 2002.  Cohen and Strang each invested a total of $500,000 in the Bayou Hedge Funds

between November 2002 and February 2004.  The Sorkins made a partial withdrawal of $46,000

from their Bayou account in 2002 .  Each of the Nine Kra-Related Defendants requested full

redemption of their respective Bayou investments in or about November 2004.

53.     In or about December 2004 or January 2005, the Bayou Hedge Funds made the

following redemption payments to the Nine Kra-Related Defendants:  Bayou Superfund made

redemption payments to Osofsky, the Rothsteins and Davidson in the amount of $288,100, Bass

in the amount of $281,700, Cohen in the amount of $540,700, and Strang in the amount of

$582,300; Bayou No Leverage Fund made redemption payments to Daniels in the amount of

$291,700 and Fleisher in the amount of $291,200; Bayou Accredited Fund made a redemption

payment to the Sorkins in the amount of $252,200.  In or about May or June 2005, the Bayou Hedge Funds made the following redemption payments to the Nine Kra-Related Defendants: Bayou Superfund made redemption payments to Osofsky, the Rothsteins and Davidson in the amount of $31,915, Bass in the amount of $31,247, Cohen in the amount of $60,072, and Strang in the amount of $64,700; Bayou No Leverage Fund made redemption payments to Daniels in the amount of $32,385 and Fleisher in the amount of $32,300; Bayou Accredited Fund made a redemption payment to the Sorkins in the amount of $28,017.  In total, all of the Eight Kra-Related Defendants received redemption payments equal to 100% of their respective Principal; in addition, Osofsky, the Rothsteins and Davidson received $70,015 in Purported Profits, Bass received $62,947 in Purported Profits, Cohen received $100,772 in Purported Profits, Strang received $147,000 in Purported Profits, Daniels received $73,634 in Purported Profits, Fleisher received $73,500 in Purported Profits, and the Sorkins received $76,217 in Purported Profits.

54.     Plaintiffs did not move for summary judgment on the Nine Kra-Related Defendants' "good faith" defenses under section 548(c) of the Bankruptcy Code, but six of the Nine Kra-Related Defendants cross-moved for summary judgment with respect to their "good faith" defenses.  In its Summary Judgment Decision, the Bankruptcy Court denied these defendants' cross-motions for summary judgment, holding that "the facts relevant to 548(c) defenses are in dispute."  In orders entered on January 28, 2009, the Bankruptcy Court referred these adversary proceedings to the U.S. District Court for trials on these defendants' "good faith" defenses under section 548(c) of the Bankruptcy Code.

55.     As embodied in each of the Settlement Agreements with the Nine Kra-Related

Defendants, once the Bankruptcy Court's orders approving the Settlement Agreements become

final and non-appealable, each of the Nine Kra-Related Defendants will return that portion of

Redemption Payments equal to 10% of Principal and 100% of Purported Profits.  Each of the

Settlement Agreements with the Nine Kra-Related Defendants contains mutual releases of all

claims against each other; accordingly, each of the Nine Kra-Related Defendants waives all

claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code,

while retaining all claims against the Government Restitution Fund.

### (7)     Myrna Bennett/John Barr III IRA and John Barr III/ Madison Capital Advisors (Exhibits R, S & T)

56.     Adversary Proceeding Defendant Myrna Bennett ("Bennett") invested $50,000 in

Bayou Fund in 1996.  In 2003, her Bayou Fund account was closed and exchanged for an

account in Bayou Superfund.  In or about March 2005, Bennett requested full redemption of her

Bayou investment.  Bayou Superfund subsequently made a redemption payment to Bennett in the

amount of $152,700, an amount equal to Bennett's Principal plus $102,700 in Purported Profits.

57.     Adversary Proceeding Defendant John Barr III IRA ("Barr") invested $50,000 in

Bayou Fund on or about July 1, 1998.  On or about February 6, 2003, its Bayou Fund was closed

and exchanged for an account in Bayou No Leverage.  On or about December 2, 2004, Barr

requested full redemption of its Bayou investment.  Bayou No Leverage subsequently made a

redemption payment to Barr in the amount of $120,900 on or about January 12, 2005, and then

another redemption payment of $13,434 on or about May 24, 2005, totaling an amount equal to

100% of Barr's Principal plus $84,334 in Purported Profits.

58.     Adversary Proceeding Defendant Madison Capital Advisors Ltd. ("Madison")
invested $75,000 in Bayou Fund on or about July 2, 1996, an additional $75,000 on or about
April 1, 1997, and a final amount of $50,000 on or about January 4, 2001.  In or about December
2002, Madison requested redemption of $150,000 of its Bayou investment.  On or about January
3, 2003, Bayou Fund made a redemption payment to Madison in the amount of $150,000.  On or
about February 6, 2003, its Bayou Fund was closed and exchanged for an account in Bayou
Accredited.  In or about December 2004, Madison requested full redemption of its Bayou
investment.  On or about January 13, 2005, Bayou Accredited made a redemption payment in the
amount of $332,800, and then another redemption payment in the amount of  $36,934.  The three
redemption payments totaled an amount equal to 100% of Madison's Principal plus $319,734 of
Purported Profits.

59.     After conducting discovery, Plaintiffs determined that they would not contest the
"good faith" defense of these three defendants.  In connection with Plaintiffs' motions for
summary judgment, Plaintiffs relinquished their claims against these defendants to recover
redemption payments of principal invested.  In its Summary Judgment Decision, the Bankruptcy
Court acknowledged Plaintiffs' relinquishment of those claims, and held that Plaintiffs are
entitled to judgment against these defendants in respect of their redemption payments consisting
of Purported Profits.  On January 29, 2009, the Bankruptcy Court entered final orders entering
judgments against these defendants.

60.     As embodied in the Settlement Agreements with Bennett and Barr, once the
Bankruptcy Court's orders approving the Settlement Agreements become final and non-
appealable, each defendant will return that portion of Redemption Payments equal to 100% of
Purported Profits.  Both Settlement Agreements contain mutual releases of all claims against

each other; accordingly, Bennett and Barr each waives all claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code, while retaining all claims against the Government Restitution Fund.

61. As embodied in the Settlement Agreement with Madison Capital, once the Bankruptcy Court's orders approving the Settlement Agreements become final and non-appealable, each defendant will return $306,486 (out of the judgment amount of $319,734) – an amount that is equal to approximately 96% of the portion of Redemption Payments consisting of Purported Profits. The Debtors agreed to settle with Madison Capital for slightly less than full amount of the judgment against Madison Capital based on Madison Capital's representation that the relevant Madison Capital fund had been dissolved a significant period of time prior to the commencement of the adversary proceeding, thereby raising collection issues for the Debtors. The Madison Capital Settlement Agreement contains mutual releases of all claims against each other; accordingly, Madison Capital waives all claims against the Debtors, including all claims under section 502(h) of the Bankruptcy Code, while retaining all claims against the Government Restitution Fund.

### (8) DB Structured Products (Exhibit U)

62. DBSP invested $16,500,000, which investment was maintained in Bayou Superfund Account #79 (the "Account #79 Investment"). DBSP used the Account #79 Investment as a means to hedge certain risks arising from a derivative transaction with Sterling Stamos. DBSP also invested an additional $16,240,000 in Bayou Superfund, which investment was maintained in Bayou Superfund Account #18 (the "Account #18 Investment"). DBSP used the Account 18 Investment as a means to hedge certain risks associated arising from second derivative transaction with a third party.

63.     On or about February 11, 2005, DBSP requested a full redemption of the Account #79 Investment.  Subsequently, on or about February 28, 2005, Bayou Superfund made a redemption payment to DBSP in the amount of $16,929,200, which is an amount equal to the Account #79 Investment plus Purported Profits in the amount of $429,200.

64.     DBSP did not seek to redeem the Account #18 Investment.

65.     Plaintiff moved for summary judgment on DBSP's "good faith" defense under section 548(c) of the Bankruptcy Code, while DBSP cross-moved for summary judgment. Plaintiff contended that DBSP lacked "good faith" because its decision to redeem the Account #79 Investment was driven by Sterling Stamos's decision to redeem each of its Bayou investments.

66.     The Bankruptcy Court denied Plaintiff's motion for summary judgment and granted DBSP's cross-motion for summary judgment on its "good faith" defenses.  The Bankruptcy Court held that, DBSP was not on inquiry notice at the time it submitted its redemption.  On January 29, 2009, the Bankruptcy Court entered final orders dismissing Plaintiffs' claims against DBSP to the extent the claims sought the avoidance and return of that portion of the Redemption Payment equal to the Bayou Superfund Account #79.

67.     As embodied in the DBSP Settlement Agreement, DBSP has agreed to return that portion of the Redemption Payment equal to 100% of the Purported Profits - $429,000 - in exchange for the Debtors agreement to waive their appeal rights.  DBSP retains its claim with respect to the Government Restitution Fund in relation to the Account #18 Investment.  In addition, DBSP's claim against the Debtors' estates, which relates to the Account #18 Investment, shall be deemed filed and amended in the amount of $16,240,000.

**(9)**     <u>High Sierra Investments and Michael Mann (Exhibits V & W)</u>

68.     Adversary Proceeding Defendants High Sierra Investments ("High Sierra") and Michael Mann ("Mann") are both partial redeemers who did not receive redemption payments equal to 100% of their respective Principal and did not receive any redemption payments consisting of Purported Profits. Both High Sierra and Mann were granted summary judgment by the Bankruptcy Court on their respective "good faith" defenses.

69.     High Sierra invested a total of $10,000,000 in Bayou Superfund in or about November 2003 and November 2004. On or about March 2, 2005, High Sierra requested a partial redemption of $9,800,000 from its Bayou account. In or about May 2005, Bayou Superfund made a series of redemption payments to High Sierra in the total amount of $8,300,000. High Sierra did not receive any further redemption payments from Bayou Superfund.

70.     Mann invested $500,000 in Bayou Superfund in or about January 2005. On or about February 15, 2005, Mann requested full redemption of his Bayou investment. In or about March 2005, Bayou Superfund made a redemption payment to Mann in the amount of $453,900. Mann did not receive any further redemption payments from Bayou Superfund.

71.     High Sierra filed a proofs of claim against each of the Debtors in the amount of $1,700,000, which claims have been delineated claim numbers 446, 470, 543, 55, 557, 558, 564, 565, and 568. Mann did not file a proof of claim with the Bankruptcy Court on account of his Bayou investment.

72.     Plaintiff moved for summary judgment on both High Sierra's and Mann's "good faith" defense under section 548(c) of the Bankruptcy Code, while High Sierra and Mann cross-moved for summary judgment. Plaintiff contended that High Sierra lacked "good faith" because significant irregularities that arose in connection with Bayou Superfund's payment of the

29

redemption to High Sierra, namely that Bayou Superfund did not, and was never able to, pay the redemption in full, placed High Sierra on objective inquiry notice of Bayou Superfund's potential financial distress. Plaintiff contended that Mann lacked "good faith" because he requested redemption after he was advised by Peter Stamos that the Sterling Stamos Funds were redeeming their Bayou investments.

73.    The Bankruptcy Court denied Plaintiff's motion for summary judgment and granted High Sierra's and Mann's cross-motions for summary judgment on their respective "good faith" defenses. The Bankruptcy Court held that, as Plaintiff conceded, High Sierra was not on inquiry notice at the time it submitted its partial redemption request, and that any facts learned by High Sierra during the time period between making the redemption request and receiving the redemption payment could not defeat its good faith. The Bankruptcy Court held that there was no evidence that Mann had knowledge of red flags putting him on inquiry notice of problems concerning the Bayou Hedge Funds. On January 29, 2009, the Bankruptcy Court entered final orders dismissing Plaintiffs' claims against High Sierra and Mann.

74.    As embodied in the High Sierra and Mann Settlement Agreements, High Sierra and Mann both have agreed to waive their respective claims and potential claims against the Debtors for their unredeemed principal – $1.7 million for High Sierra and $46,100 for Mann – in exchange for the Debtors waiving their appeal rights and dismissing their respective claims against High Sierra and Mann. Both High Sierra and Mann will retain their claims with respect to the Government Restitution Fund.

## I.    **Terms of the Settlement Agreement with Altegris Investments, Inc. (Exhibit X)**

75.    On or about July 11, 2002, Altegris entered into a selling agreement with Bayou Management and Bayou Fund (the "Selling Agreement"), whereby Altegris was appointed as one of the Bayou Fund's non-exclusive selling agents to procure subscriptions for membership interests in the Bayou Fund in exchange for certain commission payments.  On or about March 17, 2003, Altegris received a transfer of the Debtors' property in the amount of $30,000.00 (the "First Commission Payment").  On or about June 13, 2003, Altegris received a transfer in the amount of $159,449.97 (the "Second Commission Payment").  On or about January 23, 2004, Altegris received a transfer in the amount $202,521 (the "Third Commission Payment").  On or about June 17, 2004, Altegris received a transfer in the amount $92,500.00 (the "Fourth Commission Payment" and together with the First Commission Payment, the Second Commission Payment and the Third Commission Payment, the "Commission Payments").

76.    On or about January 16, 2007, Altegris filed six identical proofs of claim against each of the Debtors based on Altegris's alleged right under the Selling Agreement to indemnification and reimbursement of its legal expenses by the Debtors that are identified as claim numbers 748 to 753 by the Debtors' claims agent (the "Original Proofs of Claim").

77.    As set forth in the Original Proofs of Claim and the attachments thereto, Altegris has claimed that the Debtors each owe Altegris at least $400,532.03 as of December 31, 2006 for legal fees and expenses and other costs to third parties incurred by Altegris as a result of its participation in (a) a government investigation of the Debtors and (b) discovery conducted by the Debtor's pursuant to Rule 2004 of the Bankruptcy Code, that Altegris contends are subject to indemnification and reimbursement by the Debtors under the terms of the Selling Agreement and applicable law (the "Original Claims").

78.     On May 30, 2008, the Debtors commenced Adversary Proceeding No. 08-08294 (the "Adversary Proceeding") in the Bankruptcy Case against Altegris with the filing and service of a complaint (the "Complaint"). Through the Adversary Proceeding, the Debtors sought, among other things, to (a) avoid and preserve the Commission Payments, (b) set aside the Commission Payments, and (c) recover the Commission Payments from Altegris for the benefit of the estates of the Debtors.

79.     As a result of arms-length, and good faith negotiations, the Debtors and Altegris reached an agreement in principle to settle the Adversary Proceeding.   The Debtors have concluded that the proposed settlement, as embodied in the Settlement Agreement, is in the best interests of the Debtors' estates, and, in reaching that conclusion, have considered, among other things, the relative strength of the defenses available to Altegris, the ability to recover if successful in the litigation, the opinion of the Committee, and the cost, expense, and delay associated with further litigating the legal and factual issues implicated in the Adversary Proceeding.

80.     Significantly, the documents produced by Altegris and the deposition testimony of Altegris's witnesses indicate that Altegris will have a strong possibility of prevailing on their affirmative defense under New York Debtor and Creditor Law § 278 with respect to the First Commission Payment[4], the Second Commission Payment and the Third Commission Payment. The facts elicited from Altegris, including the contents of documents produced by Altegris, were critical to the Debtors' analysis of Altegris's likelihood of success on its affirmative defense.

---

[4]     Capitalized terms not defined herein are defined in the Settlement Agreement.

81. The principal terms of the proposed settlement, as embodied in the Settlement

Agreement, are as follows[5]:

- <u>Settlement Amount</u>.  Subject to the terms of the Settlement Agreement, and in consideration for, among other things, Altegris's release and waiver of the Customer Payment Claims as provided in the Settlement Agreement, the Parties agree to settle the Adversary Proceeding for $67,500 (the "Settled Amount").

- <u>Waiver of Claims, including Bankruptcy Code § 502(h) Claims</u>.  Altegris has agreed to waive any Bankruptcy Code §502(h) claim that may arise by virtue of the Settled Amount and also has agreed to waive its Customer Payment Claims, which Altegris alleges should be valued at $2.3 million.  Altegris shall reserve all rights with respect to Altegris's Original Claims and Additional Expense Claims (collectively, the "Altegris's Remaining Claims"), which Altegris alleges should be valued at approximately $510,000.

- <u>Contingencies Based on Resolution of Altegris's Remaining Claims</u>. In the event the resolution of Altegris's Remaining Claims results in a determination by the Bankruptcy Court that Altegris is not entitled to receive a distribution on account of any such claims, then, within ten (10) days of the entry of a corresponding final and non-appealable order, Altegris shall, tender payment of the Settled Amount to the Debtors.  In the event the resolution of Altegris's Remaining Claims results in Altegris's entitlement to a distribution from the Debtors' estates, the Debtors shall be entitled to a set off in the amount of $67,500 against any such distributions.

- <u>Exchange of Releases and Discharge of Claims</u>. Altegris and the Debtors will generally release one another (except as expressly provided in the Settlement Agreement), and any claims that have or could have been asserted against Altegris Releasees (as defined in the Settlement Agreement) based on the Commission Payments will be discharged, extinguished, and dismissed with prejudice.

---

[5] This description is merely a summary of, and is qualified in its entirety by reference to, each of the Settlement Agreement.  This description should not be used to resolve any issue of interpretation that could arise under any of the Settlement Agreement.

## PREDICATES FOR RELIEF

82.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is properly before this Court under 28 U.S.C. §§ 1408 and 1409.  The legal predicate for the relief sought herein is Bankruptcy Rule 9019.

## RELIEF REQUESTED

83.     By this Motion, the Debtors respectfully request entry of separate orders, pursuant to Bankruptcy Rule 9019, approving each of the Settlement Agreements and authorizing the Debtors to execute, deliver, and implement the Settlement Agreements.

## BASIS FOR RELIEF REQUESTED

**A.     Legal Standard**

84.     Pursuant to Bankruptcy Rule 9019, as set forth below, the Debtors submit that each of the Settlement Agreements should be authorized and approved because it is in the best interest of the Debtors, their estates and creditors, represents the sound business judgment of the Debtors, and is fair and reasonable under the circumstances.

85.     Bankruptcy Rule 9019 provides, in relevant part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bank. P. 9019(a).  Bankruptcy Rule 9019 empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  In fact, settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).

Accordingly, the Court is authorized to approve the settlement, on the terms set forth in the each of the Settlement Agreements.

86.     In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate.  TMT Trailer Ferry, 390 U.S. at 424; In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F. 3d 600 (2d Cir. 1994).  A decision to approve a particular compromise or settlement is within the sound discretion of the bankruptcy court.  Drexel Burnham, 134 B.R. at 505.  In exercising its discretion, the bankruptcy court must make an independent determination that the settlement is fair and reasonable.  Nellis v. Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994) (a court may consider the opinions of the trustee or debtor in possession that a settlement is fair and reasonable).  In addition, a bankruptcy court may exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., 217 B.R. 31 (Bankr. S.D.N.Y. 1998); see also Shugrue, 165 B.R. at 123 ("the general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above").

87.     The elements that a court should evaluate in considering whether a proposed settlement falls within the "range of reasonableness" are well-settled: (a) the probability of success in the litigation, (b) the difficulty in collecting after obtaining a judgment in the litigation, (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, (d) the interest of creditors and a proper deference to their reasonable views of the settlement, and (e) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.  See, e.g., TMT Trailer Ferry, 190 U.S. at 424; In re W.T. Grant Co., 699 F.2d 599 (2d Cir. 1983); Ionosphere Clubs, 156 B.R. at 426-27.

88. Thus, in essence, the standard under <u>TMT</u> and its progeny balances the probable success and potential costs of pursuing a claim or defense against the benefits and costs of the proposed settlement.

89. Approval of a settlement under Bankruptcy Rule 9019(a) is appropriate when the settlement is fair and equitable and is in the best interests of a debtor's estate. <u>See, e.g.</u>, <u>TMT Trailer Ferry</u>, 390 U.S. at 424; <u>Adelphia</u>, 327 B.R. at 159 (citations omitted) ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'"); <u>Nellis v. Shugrue</u>, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").

**B.    The Proposed Settlements with the Settling Redeemer Defendants Satisfy the <u>TMT</u> Factors and Should be Approved Because Each Falls Within the Range of Reasonableness**

90. In the instant case, each of the 23 proposed settlements with the Settling Redeemer Defendants is more than fair and equitable and falls well within the range of reasonableness. Indeed, the Debtors have restored to the estates one-hundred percent of the Purported Profits received by all but one of the Settling Redeemer Defendants (and 96% of Purported Profits for that one). The Debtors have also restored to the estates between 10% and 82% of Principal redeemed by many of the Settling Redeemer Defendants. Each of the Settlement Agreements contains full waivers by the Settling Redeemer Defendant of all claims and potential claims against the Debtors' estates, including all claims arising under section 502(h) of the Bankruptcy Code, thereby providing an additional economic benefit to the Debtors' estates.

91.     The Debtors have endeavored to approach the Settlement Agreements in a consistent manner, such that similar cases are settled on similar terms.  The Settlement Agreements are the product of arms-length negotiations between the Debtors and each of the Settling Adversary Proceeding Defendants and represent a good faith compromise of difficult issues raised and resolved.

92.     Thus, the Settlement Agreements with five Settling Redeemer Defendants (Haje, KFI Capital, YK, Yulman Trust, and Kaplan Foundation), whose good faith defenses were denied as a matter of law by the Bankruptcy Court and against whom the Bankruptcy Court entered judgment requiring them to return their entire redemption payments, reflect that outcome and require these five Settling Redeemer Defendants to return 75-82% of Principal and 100% of Purported Profits.  These percentages agreed to by the Debtors reflect an assessment by the Debtors of the risks and costs of defending appeals by these five Settling Redeemer Defendants, as well as the economic benefit of these Settling Redeemer Defendants' wavier of their claims, including their section 502(h) claims, against the Debtors' estates.  The Settlement Agreement with Montesi, which requires him to return 56.5% of Principal and 100% of Purported Profits, reflects these same considerations, as well as the Debtors' risk and costs of opposing Montesi's motion for reconsideration.

93.     The Settlement Agreements with the Settling Adversary Proceeding Defendants for which the Bankruptcy Court directed jury trials with respect to the defendants' affirmative good faith defense (Sledge, Highgate, and the Nine Kra-Related Defendants)  reflect that outcome by requiring these defendants to pay a smaller percentage of their respective Principal. The lower amounts of Principal to be repaid reflect the Debtors' analysis of the risks and costs involved in preparing for and conducting a trial on the good faith defense issue, as well as the

economic benefit of these defendants' waiver of their claims, including their section 502(h) claims, against the Debtors' estates.

94.     With respect to the Settling Redeemer Defendants whose good faith defense was not contested (Bennett, Barr, and Madison Capital), the settlement amounts reflect the Debtors' relinquishment, in connection with their motions for summary judgment, of their claim to recover redemption payments of Principal.  As a result, each of these Settling Redeemer Defendants will repay only Purported Profits.

95.     Finally, with respect to the Settling Redeemer Defendants who won on their cross-motions for summary judgment (High Sierra, Mann and DB), the Debtors have determined that the cost of appealing the relevant part of the Summary Judgment Decision would not be cost-effective or efficient, and therefore, have agreed to the settlement requiring the defendants to waive all claims for any non-redeemed principal, and in the case of DB, repayment of Purported Profits received (High Sierra and Mann did not receive any Purported Profits).

96.     The Debtors believe that resolving their disputes with each of the Settling Adversary Proceeding Defendants pursuant to the individual Settlement Agreement is appropriate under the circumstances.

97.     Based upon all of the foregoing, in the exercise of their business judgment, the Debtors have determined that the each of the Settlement Agreements is fair, reasonable, and equitable and in the best interests of the estates and creditors.  The Debtors therefore respectfully request that the Court approve each of the Settlement Agreements.

**C.     The Proposed Settlement with Altegris Investments, Inc. Satisfies the <u>TMT</u> Factors And Should Be Approved Because It Falls Within the Range of Reasonableness**

98.     The settlement embodies an assessment by the Debtors of their ability to prevail on a number of complex issues associated with the collapse of the Debtors' hedge funds.  The Settlement Agreement is the product of arms-length negotiations between the Debtors and Altegris and represents a good faith compromise of difficult issues raised and resolved.

99.     The adversary proceeding against Altegris alleges causes of action sounding in actual fraud pursuant to New York Debtor and Creditor Law §§ 276 and 278.  But New York Debtor and Creditor Law § 278 establishes that, in an action against a good-faith transferee, the plaintiff recovers the difference in value between the consideration that the transferee provided and the consideration it received. <u>See</u>, <u>e.g.</u>, <u>Gager v. Pittsford Dev. Corp.</u>., 6 Misc. 873, 873, 164 N.Y.S.2d 324, 326 (N.Y. Sup. 1957).  Here, the Debtors' actual intent to hinder, delay, or defraud creditors has been admitted by the Debtors' former principals.  Pursuant to New York Debtor & Creditor Law § 278, once the debtor has established actual fraud by the transferor, the burden shifts to the defendant transferee to establish that it received the transfer in good faith and for value. <u>See</u> <u>United States v. Orozco-Prada</u>, 636 F.Supp. 1537, 1542 (S.D.N.Y. 1986).  If the defendant cannot satisfy the burden, the entire transfer, including the principal, will be avoidable. <u>See</u>, <u>e.g.</u>, <u>id.</u>, at 1545.

100.     Here, Altegris has come forward with evidence that it took the First Commission Payment, the Second Commission Payment and the Third Commission Payment prior to any communication or notice of any kind that called into question the solvency, probity, regularity, or propriety of the Debtors, their former principals, or their affiliated "auditors".

101.    Accordingly, the Debtors are satisfied that Altegris has demonstrated sufficient facts to establish a likelihood of success on its individual good faith defense with respect to First Commission Payment, the Second Commission Payment and the Third Commission Payment. The Debtors therefore agreed to compromise the adversary proceeding in exchange for the waiver of the Customer Payment Claims, which Altegris has valued at approximately $2.3 million, as well as an agreement to fix Altegris's liability with respect to the Commissions Payments at $67,500.

102.    The Debtors believe that resolving their dispute with Altegris pursuant to the Settlement Agreement is appropriate under the circumstances.  Based upon all of the foregoing, in the exercise of their business judgment, the Debtors have determined that the Settlement Agreement is fair, reasonable, and equitable and in the best interests of the estates and creditors. Bayou Management therefore respectfully requests that the Court approve the Settlement Agreement.

## NOTICE

103.    Notice of this Motion has been given in accordance with the Order Establishing Notice Procedures dated May 31, 2006.  The Debtors respectfully submit that no other or further notice need be given.

## PRIOR REQUEST FOR RELIEF

104.    No previous application for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested in the Motion and granting the Debtors such other and further relief as the Court deems just and proper.

Dated: New York, New York
March 24, 2009

By: /s/ Gary J. Mennitt
DECHERT LLP
H. Jeffrey Schwartz
Gary J. Mennitt
Jonathan D. Perry
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

By: /s/ Tracy L. Klestadt
KLESTADT & WINTERS, LLP
292 Madison Avenue, 17th Floor
New York, New York 10017-6314
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Brendan M. Scott

*Attorneys for the Plaintiffs/Debtors
and Debtors-in-Possession*