UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BAYOU GROUP, LLC, <u>et al.</u>, | : | Case No. 06-22306(RDD) |
| | : | |
| Debtors. | : | Jointly Administered |

------------------------------------------------------------------x

**MEMORANDUM OF DECISION ON MOTION OF UNOFFICIAL
COMMITTEE PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) and (b)(4)**

Appearances:

>   MorrisonCohen LLP, by Joseph T. Moldovan, Esq., for the Unofficial Committee
>   of Bayou OnShore Funds

>   The United States Trustee for Region 2, by Andrew Velez-Rivera, Esq.

>   Cahill Gordon & Reindell, LLP, by Kevin J. Burke, Esq., for DB Structured
>   Products, Inc.

>   Sonnenschein Nath & Rosenthal LLP, by Carole Neville, Esq., for certain
>   investor defendants/judgment debtors

Hon. Robert D. Drain, United States Bankruptcy Judge

    The members of the Unofficial Creditors Committee of the Bayou

OnShore Funds (the "Unofficial Committee" or "Committee")[1] have requested the entry

of an order under section 503(b)(4) of the Bankruptcy Code, 11 U.S.C. §§ 101 <u>et seq.</u>,

allowing, as administrative expenses, the fees and expenses of counsel to the Committee

for pre-bankruptcy services (the "Motion").  The Motion seeks payment by the estate of

$677,829.17.  The United States Trustee objected to the Motion, as have certain judgment

debtors -- generally known as the "Sonnenschein Defendants" -- of the debtors herein

---

[1] The movants, who at one time or another were members of the Unofficial Committee, are Silvercreek Long/Short Holdings LLC ("Silvercreek"), DePauw University, 6800 Capital L.L.C./Bermuda Fund, L.P., Rembrandt & Partners/Southwind Partners, Regent University, John H. Williams, LIBOR Partners/305 Partners, and Phoenician Trading Partners.

(the "Debtors" or the "OnShore Entities").  A creditor, DB Structured Products, Inc., joined in the Sonnenschein Defendants' objection.[2]

The Court has reviewed the pleadings filed in connection with the Motion as well as the exhibits thereto, including the contemporaneous time and expense records of the Unofficial Committee's counsel, and considered the record of the March 5, 2010 hearing on the Motion.  This Memorandum of Decision states the Court's basis for substantially granting the Motion and, except as noted, overruling the objections.

### Background

Notwithstanding the rationale in Samuel Israel III's July 26, 2005 letter to investors that he was closing the Bayou family of funds to devote more time to his family and personal life, it became clear in the late summer of 2005 that the Bayou funds (including the OnShore Entities) were a Ponzi scheme, their earnings fraudulently reported and largely fictitious, and, therefore, that they were doomed to collapse.  Soon thereafter, federal authorities raided the funds' Connecticut offices and seized their contents, and the funds' principals were placed in federal custody and their assets were subjected to seizure and forfeiture.  (Eventually certain cash of the Debtors and/or their principals also was turned over by Arizona regulators to the Department of Justice.)  Nevertheless, apparently because of disagreements among the SEC, the CFTC and the

---

[2] The Sonnenschein Defendants have been adjudicated to be liable for the receipt of substantial avoidable transfers from the Debtors.  They have not paid or turned over those transfers to the estate and, therefore, under 11 U.S.C. § 502(d), any claim that they may have in these cases is disallowed.  Consequently, the Court separately determined that they do not have party-in-interest standing.  The Court also denied their motion for permissive intervention in respect of the Motion under Bankruptcy Rule 2018(a), on the basis that their interests were adequately represented by the United States Trustee and DB Structured Products, Inc.

Department of Justice, the governmental authorities did not actively seek the appointment of an equity receiver for the OnShore Entities.[3]

When it became clear that the appointment of an equity receiver might not be forthcoming, various investors in the OnShore Entities who had been unable to redeem their investments before the funds' collapse and, therefore, were looking for ways to make good their losses, contacted each other.  Although still operating largely in the dark, by January 2006, several of them determined, with the advice of counsel to individual investors, to form the Unofficial Committee to represent the interests of defrauded investors as a whole.

The largest investor, Silvercreek sent a notice of the proposed formation of the Unofficial Committee to all creditors with whom it or other investors were in contact, and the United States Attorney's office also agreed to include a notice of the Committee's proposed formation in a general notice to Bayou fraud victims, which apparently was mailed on February 2, 2006.  Declaration of Jonathan J. Fisher in Support of the Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies' Motion to Appoint a Receiver ¶¶ 4-5.  Forty-two creditors with in excess of $109 million of unpaid investments responded.  On February 7, 2006, six of the largest investors agreed to sit on the Unofficial Committee and to retain counsel for the Committee, the cost of which they agreed to share pro rata based on the amount of their unpaid investments.  Id. ¶¶ 5-6.

---

[3] Liquidation proceedings were commenced in the Cayman Islands against Bayou off-shore entities, and the court-appointed liquidator for those entities obtained ancillary relief in the United States Bankruptcy Court for the District of Connecticut in furtherance of the Cayman Islands liquidation proceedings.

Actually the Unofficial Committee retained two firms: Preston Gates Ellis & Rouvelas Meeds LLP (now K&L Gates LLP), on February 22, 2005, and Kasowitz, Benson, Torres & Friedman LLP ("KBLT&F"), on March 1, 2005.

With K&L Gates' assistance, the six investors further publicized and organized the Unofficial Committee's formation and held the Committee's first official meeting, which took place on February 28, 2005.

Based on the March 5, 2010 hearing record and on the Unofficial Committee's Bylaws, which were approved at a March 14, 2005 meeting, it appears that the Committee was indeed established to represent the collective interests of all unsecured creditors of the OnShore Entities, the vast majority of which were defrauded investors. The Unofficial Committee's overarching goal was "to represent the interests of creditors holding unsecured claims against one or more of the on-shore entities comprising the Bayou family of companies . . . by facilitating the marshalling of assets of Debtor and prompt distribution to creditors." By-laws of the Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies ("Bylaws") Art. II. This goal was inconsistent with interests that the individual Committee members may have had to increase their own recovery at the expense of other similarly situated creditors. Given the Unofficial Committee members' cost sharing agreement, it also was in their interest to add to the voting membership of the Committee and thus reduce their pro rata share of the costs. The Unofficial Committee sought wide participation in its activities, not only encouraging investors to become voting members but also inviting investors to participate as non-voting ex officio members.

It was clear even before the Unofficial Committee's formation that a significant source of creditor recovery (and perhaps the primary source, given that the Bayou funds' hard assets and the assets of its principals had been seized and were subject to criminal forfeiture) was the Debtors' potential claims against investors who had redeemed or partially redeemed their investments before the OnShore Entities' collapse. The Sonnenschein Defendants, so-called "full redeemers," turned out to be such a target; DB Structured Products, Inc., a so-called "partial redeemer" (that is, an investor who was repaid some but not all of its investment before the OnShore Entities' collapse) was another.

DB Structured Products, Inc. has contended that the Unofficial Committee ignored its legitimate concerns as a creditor in respect of its claim for the portion of its investment that was not redeemed, and, in fact, after the commencement of the bankruptcy case the official committee of unsecured creditors, which substantially overlapped with the prepetition Unofficial Committee, may have favored strategies to exert litigation leverage on DB and other similarly situated partial redeemers that gave short shrift to those entities' rights as creditors. However, review of counsel to the Unofficial Committee's time records and the other pleadings filed in connection with the Motion establish that the Unofficial Committee did not engage in such conduct prepetition. Moreover, members of the Unofficial Committee included other partial redeemers, and the United States Trustee has not asserted any undue parochialism on the Unofficial Committee's part as a basis for objecting to the Motion (or as a basis, for that matter, for objecting to the fees of counsel to the official unsecured creditors committee). The Sonnenschein Defendants' contention that the Unofficial Committee was unduly

hostile to them is not relevant, given that the Sonnenschein Defendants were solely

litigation targets and not creditors at all.

In addition to its goal of representing all creditors, it also is clear that from

its inception the Unofficial Committee expressly laid the groundwork for what became

this chapter 11 case, including the means for administering the case.  The Bylaws state

that to achieve its purpose the Unofficial Committee may engage in the following:

> (1) Evaluate the need to seek support for and implementation of a process for judicial appointment of a receiver/<u>trustee</u> to marshal assets and make distributions to creditors;

> (2) Evaluate prospects and make recommendation for the selection of a receiver/<u>trustee</u>;

> (3) Monitor and work with the receiver/<u>trustee</u> or other fiduciary acting on behalf of the creditors to facilitate an efficient and timely forensic investigation, pursuit of claims, and, if appropriate, <u>the commencement of a bankruptcy proceeding</u>;

> (4) Negotiate and formulate a <u>liquidation plan</u> to facilitate prompt distribution of Debtor's assets with adequate reserve to finance the pursuit of additional assets, including claims of the Debtor or the Debtor's creditors; and

> (5) Any other acts determined by the Committee to be reasonable or necessary to achieve the overall objective.

Bylaws Art. II (emphasis added).  Moreover, the Bylaws recognized that

> In its pursuit of the above described objectives, the Committee intends, to the extent practicable and except as otherwise determined, <u>to constitute itself in conformity with Federal Rule of Bankruptcy Procedure 2007(b) so that the Committee is well situated to be appointed as the Official Unsecured Creditors' Committee, pursuant to 11 U.S.C. § 1102(b)(1)</u>[4] in

---

[4] Bankruptcy Code section 1102(b)(1) provides for the possibility of the appointment of the members of a prepetition committee to the official committee of unsecured creditors.  Bankruptcy Rule 2007(b) provides that the bankruptcy court may find that a committee organized by unsecured creditors before the commencement of a chapter 11 case was fairly chosen for purposes of its members serving as the official committee of unsecured creditors under Bankruptcy Code section 1102 if certain criteria ensuring adequate notice and a proper record of the committee's formation meeting were met and "the organization of the committee was in all other respects fair and proper."  Fed. R. Bankr. P. 2007(b).

<u>any case filed by or with respect to the Debtor under Title 11 of the United
States Code</u>.

<u>Id.</u> (emphasis added).[5]  As will be discussed in more detail below, when the Committee

sought the appointment of a receiver, it also requested that the receiver's duties include,

in the receiver's capacity as sole managing member of the OnShore entities, (a)

petitioning to commence a case under the Bankruptcy Code and (b) serving as the debtor

in possession in a case under chapter 11 of the Bankruptcy Code.  [Proposed] Order

Granting the Unofficial On-Shore Creditors' Committee's Motion to Appoint a Receiver

¶ 7(e).

Having organized itself and retained counsel, the Unofficial Committee, in

large measure through its counsel, performed the following tasks:

- researched potential claims of the OnShore Entitles, or assertable
  on behalf of their creditors as a group, including against
  "redeemers" and "partial redeemers;"

- searched for suitable candidates to serve as receiver/managing
  member of the OnShore Entities, identified the individual, Jeffrey
  Marwil, who eventually was appointed as receiver and sole
  managing member, and negotiated the terms of Mr. Marwil's
  compensation;

- researched and prepared a complaint and motion for the
  appointment of a receiver and sole managing member for the
  OnShore Entities, and related injunction;

- obtained the consent, or non-opposition, of important parties,
  including the Department of Justice, the Cayman Islands
  liquidator, and class counsel, to the motion for appointment of a
  receiver and sole managing member;

- obtained the District Court's approval of the receiver/sole
  managing member motion substantially in its entirety, which, after
  wide notice, was unopposed;

---

[5] The Unofficial Committee also required that its professionals meet the "no adverse interest" and
"disinterested" requirements of Bankruptcy Code sections 328(c) and 1103(b).  <u>Id.</u>  Art. VIII(1).

- shared its legal research of potential claims on behalf of the OnShore Entities and their creditors as a whole with Mr. Marwil and his counsel after Marwil's appointment, pursuant to a common interest agreement; and

- on the borrower side, obtained and documented a preliminary financing commitment that served as the basis for debtor in possession financing once the OnShore Entities sought relief under chapter 11.

Based on the time records of the Unofficial Committee's two counsel, these are the only tasks for which the Committee seeks reimbursement. The time records begin only with the firms' retention after the formation of the Committee; they do not include time previously spent in the firms' capacity as counsel to individual Committee members.

## Jurisdiction

This Court has jurisdiction over the Motion, which arises under section 503(b) of the Bankruptcy Code, under 28 U.S.C. §§ 1334(b) and 157(a) and the provisions of the Debtors' confirmed chapter 11 plan and the confirmation order that reserved such jurisdiction. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

## Discussion

Bankruptcy Code section 503(b)(3)(D) provides for the allowance as an administrative expense of

the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by a . . . committee of creditors . . . other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter . . . 11 of this title.

(Emphasis added.)

Section 503(b)(4) of the Bankruptcy Code provides for the

allowance as an administrative expense of

> reasonable compensation for professional services <u>rendered by an attorney</u>
> . . . <u>of an entity whose expense is allowable under subparagraph . . . (D) of</u>
> <u>paragraph (3) of this subsection</u>, based on the time, the nature, the extent,
> and the value of such services, and the cost of comparable services other
> than in a case under this title, and reimbursement for actual, necessary
> expenses incurred by such attorney. . . .

(Emphasis added.)

Before turning to whether the requested fees and expenses of the

Unofficial Committee's counsel were reasonable based on the time, the nature, the extent,

and the value of such services and the cost of comparable services in contexts other than

cases under the Bankruptcy Code, and to whether counsel's expenses were necessary, a

threshold issue raised by the United States Trustee must be addressed.  Do Bankruptcy

Code sections 503(b)(3)(D) and (b)(4) apply to the Committee's and its counsel's <u>pre-</u>

<u>bankruptcy</u> work, and, if so, what kind of work falls within the coverage of those

sections?

One starts with the statute's text and ends there if the meaning is plain and

the disposition required by the plain meaning is not absurd.  <u>Lamie v. United States</u>

<u>Trustee</u>, 540 U.S. 526 (2004).  Here, the key phrase is Bankruptcy Code section

503(b)(3)(D)'s requirement, as incorporated in section 503(b)(4), that the Unofficial

Committee be eligible to be reimbursed for expenses "in making a substantial

contribution in a case under chapter 11."  Does this mean that the Committee's

substantial contribution had to be made <u>during</u> the chapter 11 case for it to be eligible

under section 503(b)(3)(D)?  It would, of course, if the statue actually said "during"

instead of "in."

9

One might argue, however, that the statute could have used the preposition "to" instead of "in" if Congress really meant it to apply to a contribution made before, but with respect to, a subsequent chapter 11 case, or if the statute said "in furtherance of" or, even better, "in or in contemplation of" a chapter 11 case.[6]

In support of the United States Trustee's interpretation that section 503(b)(3)(D) applies only to postpetition activity, it is also worth noting that for an expense to be accorded administrative priority under Bankruptcy Code section 503(b)(1)(A), which covers "the actual, necessary costs and expenses of preserving the estate"[7] (a concept that conceivably could include pre-bankruptcy costs and expenses as long as they could be said to have preserved the subsequently created, postpetition estate), the case law is clear that the expense must, among other things, derive from a postpetition transaction with the debtor in possession or trustee or a postpetition tort by the debtor in possession or trustee.  Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 479 F.3d 167, 172 (2007); Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986); see also In re Refco, Inc., 2008 U.S. Dist. LEXIS 2484, *16-17 (S.D.N.Y. Jan. 14, 2008), aff'd Palley v. Refco Inc. (In re Refco Inc.), 331 Fed. Appx. 12 (2d Cir. 2009); In re Norwalk Furniture Corp., 418 B.R. 631 (Bankr. N.D. Ohio 2009).  For example, in the latter case, the court stated that it did not question that the claimant's prepetition services conferred a substantial economic benefit on the entity that became the chapter 11 debtor in possession; more was needed for administrative expense treatment under section 503(b)(1), however, because "the bankruptcy estate only comes into existence when a case is commenced. . . .

---

[6] Even the use of the word "to" instead of "in" could be read as making the movant's contribution dependent on a pre-existing case.

[7] 11 U.S.C. § 503(b)(1)(A).

10

Consequently, [the claimant's] services, having been performed prior to the filing of a

petition in bankruptcy, could not have accorded a direct benefit upon the Debtor's estate

as, by definition, no bankruptcy estate existed." In re Norwalk Furniture, 418 B.R. at

633-34. See also In re Lockwood Enterprises, Inc., 54 B.R. 829, 831-32 (Bankr.

S.D.N.Y. 1985).

Similarly, one can argue that the OnShore Entities' chapter 11 case did not

exist when the Committee was operating and, therefore, that the Committee could not

have made a substantial contribution in such case for purposes of section 503(b)(3)(D).

This interpretation would also be in keeping with the general rule that priorities must be

narrowly construed in light of the presumption in bankruptcy cases that the debtor's

limited resources will be equally distributed among all unsecured creditors. Howard

Delivery Serv. v. Zurich Am. Ins. Co., 547 U.S. 651, 667 (2006); In re Bethlehem Steel,

479 F.3d at 172.

On the other hand, it can be argued that because Congress chose to put the

"substantial contribution" test in a different subsection of section 503(b) than subsection

(b)(1)(A), the foregoing interpretations of section 503(b)(1)(A) should not apply to it.[8]

More significantly, it has been held that the language of section

503(b)(3)(D) is, by its plain terms, applicable not only to postpetition activity but also to

---

[8] Two subsections of Bankruptcy Code section 503(b)(3) more clearly contemplate administrative priority status for prepetition expenses:  subsection 503(b)(3)(A), pertaining to the expenses of creditors who file an involuntary case under Bankruptcy Code section 303, and subsection 503(b)(3)(E), pertaining to the expenses of a prepetition custodian superseded under Bankruptcy Code section 543.  Neither of these sections, however, uses language that assists in the interpretation of subsection 503(b)(3)(D)'s use of the phrase "substantial contribution in a case under . . . chapter 11."  Nor does subsection 503(b)(3)(B), which clearly covers only postpetition activity, because it requires prior bankruptcy court approval, or subsection 503(b)(3)(F), which covers expenses of a member of an official committee appointed under section 1102 of the Bankruptcy Code incurred in the performance of such committee's duties -- such a committee by its nature being a postpetition creation (although, as noted above, under Bankruptcy Code section 1102(b)(1) and Bankruptcy Rue 2007 the members of a prepetition committee may be appointed to an official committee "if such [prepetition] committee was fairly chosen and is representative of the different kinds of claims to be represented").

prepetition activity.  Thus, as stated by the Third Circuit, "It is the 'substantial

contribution,' not the activity, that must occur 'in a case' under chapter 11, and the

[contrary] argument assumes that activities conducted and expenses incurred before the

filing of a chapter 11 petition cannot substantially contribute to the reorganization efforts

during the pendency of a chapter 11 case" when, in fact, they can.  Lebron v, Mechem

Fin. Inc., 27 F.3d 937, 944 (3d Cir. 1994).

The Lebron court found further support for its construction of section

503(b)(3)(D) in extensive pre-Bankruptcy Code precedent:  "Under section 77(B)(c) of

the Bankruptcy Act, reimbursement of fees was authorized for pre-petition services of

informal committees of creditors and stockholders where those services directly

benefitted the reorganization."  Id. at 945 (citations omitted).  See also Randolph &

Randolph v. Scruggs, 190 U.S. 533, 538-39 (1903) (allowing administrative claim under

the Bankruptcy Act for prepetition services by assignee for creditors).  Further, the

legislative history of section 503(b)(3)(D) indicates that Congress "intended to alter

preexisting law in only one respect:  'It does not require a contribution that leads to

confirmation of a plan [because Congress believed that in] many cases it will be a

substantial contribution if the person involved uncovers facts that would lead to a denial

of confirmation, such as fraud in connection with the case.'"  Lebron, 27 F.3d at 945,

citing 1978 U.S.C.C.A.N. at 5852-53.

At a minimum, the Third Circuit's reading of section 503(b)(3)(D)

suggests that the provision does not "plainly" draw a line between pre- and postpetition

conduct, which ambiguity renders both pre-Bankruptcy Code practice and the legislative

history relevant.  Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S.

1, 10 (2000); <u>Dewsnup v. Timm</u>, 502 U.S. 410, 418 (1992) ("Congress must have enacted

the Code with a full understanding of this [clearly established] practice.").

        Several other courts have also recognized (although most only in dicta,

because they ultimately determined that the movant had not established that it made a

substantial contribution) that section 503(b)(3)(D) should not be confined to postpetition

activity.  <u>See</u> <u>Haskins v. United States</u> (<u>In re Lister</u>), 846 F.2d 55, 57 (6th Cir. 1988)

(dictum); <u>In re Trans World Airlines, Inc.</u>, 1993 U.S. Dist. LEXIS 16810, at *22-28 (D.

Del. June 22, 1993); <u>In re Alert Hldgs. Inc.</u>, 157 B.R. 753, 758 (Bankr. S.D.N.Y. 1993)

("I am not prepared to hold . . . that as a bright line rule, services performed during

prepetition negotiations and attempted workouts are not compensable under section

503(b) of the Bankruptcy Code.") (dictum); <u>In re Texaco, Inc.</u>, 90 B.R. 622, 630 (Bankr.

S.D.N.Y. 1988) (dictum); <u>In re Russell Transfer, Inc.</u>, 59 B.R. 871, 872-73 (Bankr. W.D.

Va. 1986); <u>In re Valley Isle Broadcasting, Ltd.</u>, 56 B.R. 505, 506 (Bankr. D. Haw. 1985)

(dictum); <u>In re Med General, Inc.</u>, 17 B.R. 13, 14 (Bankr. D. Minn. 1981).

        At least two courts have skirted the issue, either determining that it was

premature to take a position in the context of the particular chapter 11 case on whether

section 503(b)(3)(D) applies to prepetition work, <u>In re Financial News Network, Inc.</u>, 134

B.R. 732, 736-37 (Bankr. S.D.N.Y. 1991), or that the movant had not made a substantial

contribution in any event.  <u>In re Yellowstone Mountain Club, LLC</u>, 2009 Bankr. LEXIS

3654, at *13-14 (Bankr. D. Mont. Nov. 12, 2009).

        Two courts in this district, however, have held that Bankruptcy Code

section 503(b)(3)(D) does <u>not</u> apply to a creditor's prepetition activity, in each case

where it appeared that the creditor was attempting to use section 503(b)(3)(D) to

circumvent Bankruptcy Code section 503(b)(1)(A)'s clear, bright line test between pre-

and postpetition transactions.  Short Pump Entm't, L.L.C. v. Randall's Island Family

Golf Ctrs. Inc. (In re Randall's Island Family Golf Ctrs. Inc., 300 B.R. 590, 598 (Bankr.

S.D.N.Y. 2003); In re Balport Constr. Co., 123 B.R. 174, 180-81 (Bankr. S.D.N.Y.

1991).  See also In re T & B Mortg. Corp., 2008 Bankr. LEXIS 1674, at *6-9 (Bankr.

E.D. Va. May 27, 2008) (noting that section 503(b)(3)(D) does not apply in chapter 7

cases but also disagreeing with the TWA and Russell Transfer courts' application of it to

prepetition activity in the chapter 11 context).

What stands out in all of the foregoing cases is the difficulty highlighted

by Randalls Island Family Golf Centers and Balport:  when, if ever, may prepetition

expenses properly be viewed as "expenses . . . incurred . . . in making a substantial

contribution in a case under . . . chapter 11" under section 503(b)(3)(D) even though they

would not qualify, simply because they were incurred prepetition, under section

503(b)(1)(A) as "expenses of preserving the estate"?  This, in turn, highlights the

difficulty of determining what qualifies as a "substantial contribution," a term that the

Bankruptcy Code does not define.  The answer to those two problems should resolve the

underlying issue of whether Congress intended section 503(b)(3)(D), whose text the

Court concludes is not entirely plain on this point, to apply to prepetition work.  Ensuring

that section 503(b)(3)(D) is not applied to circumvent section 503(b)(1)(A) in this context

also may confer some added clarity to the "substantial contribution" standard generally.

Certain aspects of the term "substantial contribution" are well recognized.

The substantial contribution inquiry is factual, with the movant bearing the burden by a

preponderance of the evidence.  In re United States Lines, Inc., 103 B.R. 427, 429

14

(Bankr. S.D.N.Y. 1989).  Also, the section's policy of promoting meaningful creditor participation in the reorganization process is in tension with the contrasting policy, noted above, that provisions establishing administrative expenses should be construed narrowly and administrative expenses kept to a minimum.  Id.  See also In re Dana Corp., 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); In re Granite Partners, L.P., 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) ("substantial contribution provisions must be narrowly construed" including to "discourage mushrooming expenses" and "do not change the basic rule that the attorney must look to his own client for payment").

Accordingly, "The integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."  In re Best Prods. Co., Inc., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994).  See also In re Granite Partners, 213 B.R. at 445 (movant must show "actual and demonstrable benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders"); In re Alert Hldgs., 157 B.R. at 757.  See also In re Am. Plumbing & Mech., Inc., 327 B.R. 273, 280 (Bankr. W.D. Tex. 2005) (citing cases requiring a "significant and tangible benefit," a "concrete benefit," a "direct, significant and demonstrably positive benefit," and a contribution that is "considerable in amount, value or worth").

The Am. Plumbing court rightly observed, though, that "The problem with all these synonyms and definitions is that they do little to shed any real light on how to apply the direct benefit rule in practice."  Id. at 280-81.  Case law has, however, narrowed the imprecision arising from the statute's language.  Id. at 281.  To qualify, the direct benefit must be a substantial net benefit.  In re Granite Partners, 213 B.R. at 446.

A direct benefit also cannot be established merely by the movant's extensive participation in the case or be based on services that duplicated those of professionals already compensated by the estate, such as counsel for the debtor or an official committee. Id.; In re Dana Corp., 390 B.R. at 108; see also Hall Fin. Group v. DP Partners Ltd. Pshp. (In re DP Partners Ltd. Pshp.), 106 F.3d 667, 673 (5th Cir. 1997), cert. denied, 522 U.S. 815 (1997).

Relatedly, "Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily for their own interests" and "[e]fforts undertaken by creditors solely to further their own self interest are not compensable under section 503(b)" and "services calculated primarily to benefit the client do no jusify an award even if they also confer an indirect benefit on the estate." In re Dana Corp., 390 B.R. at 108 (internal citations omitted); In re Granite Partners, 213 B.R. at 446; In re Am. Plumbing & Mech., 327 B.R. at 284-85.

Importantly, this last consideration is relevant not because the creditor's mere motive should determine the outcome (see In re DP Partners Ltd. Pshp, 106 F.3d at 673; In re Pow Wow River Campground, Inc. 296 B.R. 81, 86 (Bankr. D. N.H. 2003)); rather, it recognizes that section 503(b)(3)(D) focuses on process as much as on contribution, on the movant's substantial contribution in the case -- that is, the entire chapter 11 case -- and, generally speaking, the proper administration of the case as a whole rarely contemplates individual creditors or even unofficial committees contributing to the case.[9]  Normally, it is the job of professionals retained under sections 327 and 328

---

[9] There is no excuse, over thirty years after the enactment of the Bankruptcy Code, for lawyers practicing in bankruptcy court to continue to refer to bankruptcy cases as "proceedings."  "Proceedings" are discrete types of litigated matters within the larger bankruptcy case, and the correct terminology, including section 503(b)(3)(D)'s use of the word "case," has a practical meaning,

of the Bankruptcy Code, and ultimately of the Court, to ensure that chapter 11 cases

proceed properly and efficiently.  Third parties, who generally represent only their

clients' interests and only indirectly contribute to the case's administration, therefore

normally would not be compensated by the estate on an administrative priority basis.

Instead, "compensation under section 503 is reserved for those rare and extraordinary

circumstances when the creditor's involvement truly enhances the <u>administration</u> of the

estate."  <u>In re Dana Corp.</u>, 390 B.R. at 108 (emphasis added); <u>see also</u> <u>In re Texaco, Inc.</u>,

90 B.R. at 630 (in addition to showing an actual and demonstrable benefit to the estate,

compensation for fees incurred prepetition must substantially contribute to the

<u>administration</u> of the debtors' estates post-petition") (emphasis added); <u>In re Richton</u>

<u>Int'l. Corp.</u>, 15 B.R. 854, 856 (Bankr. S.D.N.Y. 1981).

      Thus, section 503(b)(3)(D) and (b)(4) may not be used to buy off a pest,

who did little if anything to advance, and in fact may have impeded, the proper

administration of the case.  <u>In re Dana Corp.</u>, 390 B.R. at 110-11; <u>In re Granite Partners</u>,

213 B.R. at 448-49.  Nor may section 503(b)(3)(D) and (b)(4) be relied on to reward

creditors and unofficial committees who merely furthered their own or their constituents'

interests, the Code having established other claims and priorities for such expenses.  <u>See</u>

11 U.S.C. § 506(b) (allowing oversecured creditors' claim for fees and expenses, to be

paid from collateral); <u>Travelers Cas. & Sur. Co. of Am. v. PG&E</u>, 549 U.S. 443, 453

(2007) (recognizing potential allowance of general unsecured claim for postpetition

attorneys fees under 11 U.S.C. § 502(b)); <u>Ogle v. Fid. & Deposit Co.</u>, 586 F.3d 143, 149

(2d Cir. 2009) (allowing general unsecured claim for postpetition attorneys fees provided

for in prepetition contract).  <u>See generally</u> <u>In re Buttes Gas & Oil Co.</u>, 112 B.R. 191, 195

(Bankr. S.D. Tex. 1989) ("[Movant] claims that its most significant contribution related to the development of a confirmed Plan.  However, there is no dispute that the Plan was consensual and as such was the goal for which all parties were striving.  There was no evidence that [Movant] functioned as more of a peacemaker than did any other creditor. Further, the Plan and the disclosure statement were submitted and presented by the Debtor, which is represented by its own counsel."); In re Valley Isle Broadcasting, 56 B.R. at 507 ("Applicant in reality did what any other attorney would do under the circumstances:  that is, defend against actions brought against the debtor [by secured creditors], and to attempt to effectuate a settlement.").

The majority of cases allowing creditors' substantial contribution claims under sections 503(b)(3)(D) and (b)(4) have, therefore, found that the creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed; most have, consistent with pre-Bankruptcy Code practice, involved a creditor who actively facilitated the negotiation and successful confirmation of the chapter 11 plan or, in opposing a plan, brought about the confirmation of a more favorable plan.  See generally In re Granite Partners, 213 B.R. at 446-47.  Even in the cases, noted by Judge Bernstein in Granite Partners, where courts have granted substantial contribution awards in other contexts because the creditor's efforts led to a concrete, measurable monetary benefit for the estate, id. at 447, the movants performed functions that normally would have been undertaken by estate-compensated professionals, or that had to be performed because estate compensated professionals were not doing their job.  See In re McLean Indus., Inc., 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988); and In re Baldwin-United Corp., 79 B.R. 321, 344 (Bankr. S.D. Ohio 1982),

18

where the movants' actions directly led to materially enhanced bids for estate assets.  See also 4 Collier on Bankruptcy ¶ 503.10[5] (15th ed. 2009) at 503-65 (listing instances of "substantial contribution" awards earned other than in the plan context).[10]

Particularly when the services at issue were performed pre-bankruptcy, the foregoing emphasis on the movant's contribution in place or instead of professionals who normally would be compensated out of the debtor's assets is important.  The cost of such services will much more likely merit allowance under section 503(b)(3)(D) if the services led directly to the efficient and proper administration of the case when other parties, who normally would be expected to do the work at the debtor's expense, were not doing it. Compare In re Med General, Inc., 17 B.R. at 14 ("[T]he informal creditors' committee was engaged in the beginning of a continuous process which eventuated in the acceptance of a plan of reorganization beneficial to the general creditors.  I see no reason to distinguish on the facts known to the Court between the beneficial results of the pre-petition activity as opposed to the post-petition activity of the committee which is admittedly compensable) and In re Alert Hldgs., 157 B.R. at 758; In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 569 (Bankr. D. Utah 1985), in which the creditors' prepetition workout efforts were in keeping with normal prepetition creditor conduct and therefore did not contribute to the subsequent bankruptcy case.  See also Lebron, 27 F.3d at 945 n.3 (noting, as a basis not precluding prepetition services from the reach of section

---

[10] As noted above, it is clear from section 503(b)(3)(D)'s legislative history that Congress did not intend the section to be limited to pre-Bankruptcy Code practice limited to plan-related activity.  S. Rep. No. 95-595, 95th Cong., 2d Sess. 67 (1978).

503(b)(3)(D), that Congress recognized in Bankruptcy Code section 1102(b) a possible continuum of creditor committee representation pre- and postpetition).[11]

On the other hand, if the movant argues merely that, but for some action that it took prepetition, the chapter 11 case would not have been filed or steps would not ultimately have been taken to recover and marshal the debtor's assets for creditors, the creditor would have a heavy burden to show that it made a "substantial contribution in the case" as opposed to having merely pursued its rights as a creditor.  See Lebrun, 27 F.3d at 946 (noting that movant's prepetition efforts in uncovering the debtor's fraud may not meet section 503(b)(3)(D)'s test because they were incurred "in litigation over control of [the debtor] many months before a reorganization was anticipated by anyone"); Lister, 846 F.2d at 55, in which the Tenth Circuit held that a creditor was not entitled to a section 503(b)(3)(D) expense for gathering information on, and preventing the transfer of, the debtors' assets prepetition, which eventually forced the debtors into bankruptcy:

> Mr. Haskins undertook these pre-petition efforts solely for the purpose of collecting his judgment.  His actions could not have been undertaken in anticipation of the reorganization of the debtors, as he was unaware of the pendency of bankruptcy proceedings until after the petition had been filed. Any benefit accruing to the bankruptcy estate as a result of these efforts was only incidental.

Id. at 57.  Finally, if the movant's argument is only that it provided some good or service that enhanced the estate, instead of contributing directly to the administration of the case, its request would more properly be viewed as one under section 503(b)(1)(A) and, therefore, be barred because of the prepetition nature of the transaction.

---

[11] The issue of the applicability of sections 503(b)(3)(D) and (b)(4) to prepetition activity may arise as rarely as it does because in practice it is commonplace during pre-bankruptcy negotiations for corporate debtors to pay the reasonable fees and expenses of the professionals working for the key creditor groups with whom they are negotiating.

In light of the foregoing, it is clear that the Unofficial Committee would qualify under Bankruptcy Code section 503(b)(3)(D) as having made a substantial contribution in the case that a debtor-compensated professional should have made but did not, and that its counsel, therefore, are entitled to reasonable compensation and reimbursement of their necessary expenses relating to such contribution under Bankruptcy Code section 504(b)(4).[12]

Several points about the Unofficial Committee's activities in this regard are worth noting. First, the Committee clearly worked with an eye to the prompt commencement of an organized chapter 11 case. This was no small aim, given this particular Debtor and the absence of any fiduciary for the OnShore Entities who could protect the Debtor's and creditors' interests generally until Mr. Marwil's appointment. Second, the Committee took upon itself the task (and perhaps some inherent related risk) of representing the interests of the OnShore Entities' creditors as a whole. Indeed, the Unofficial Committee specifically contemplated and prepared for the members of the Committee being appointed as members of an official creditors committee under Bankruptcy Code section 1102(b)(1) after the start of the contemplated chapter 11 case.

Having retained K&L Gates on February 22, 2006, the Unofficial Committee filed the receiver motion on March 28, 2006, it obtained the order appointing Mr. Marwil on April 28, 2006, and Mr. Marwil filed the chapter 11 case on May 30, 2006 and the complaints to avoid redemptions and other potential recoverable transfers shortly thereafter, all in about the minimum time permitted considering notice requirements and proper planning. There was at least one good reason for such speed separate and apart

---

[12] "While the language of section 503(b)(4) does not specifically limit the professional services to those incurred in the activity for which the entity qualified for treatment under section 503(b)(3), courts have had no trouble implying such a requirement." 4 Collier on Bankruptcy ¶ 503.11[3] at 503-69-70.

from wanting to move on to the last stage of the process, the filing of a chapter 11 case

and the invocation of the automatic stay under Bankruptcy Code section 362(a):  to

reduce the risk that potential assets subject to recovery would dissipate and that evidence

would become stale.  However, it is clear from counsel's time entries that this goal was

consistent with the Committee's representation of the interests of creditors generally and

its desire to organize the prompt filing of a reasonably orderly chapter 11 case.

That desire is also reflected in the Committee's efforts during the same

prepetition period to line up debtor in possession financing, which was approved in the

early days of the chapter 11 case, and, therefore clearly benefitted the Debtors' estates

and creditors and substantially contributed to the chapter 11 cases.[13]

One element of the Unofficial Committee's activities, which gave rise to

the largest amount of counsel fees and expenses, is, nevertheless, the second basis for the

United States Trustee's objection.  The Committee members did not file an involuntary

case under section 303 of the Bankruptcy Code (for which their fees and expenses would

have been subject to allowance as an administrative expense under Bankruptcy Code

section 503(b)(3)(A)).[14]  Instead, the Committee sought the prepetition appointment of a

receiver with operating powers, as the Debtors' sole managing member, including the

power to commence a voluntary chapter 11 case for the OnShore Entities and to serve as

the OnShore Entities' managing member in such a case.  The Committee obtained this

relief when the District Court entered the order granting the unopposed

---

[13] There was no assurance that the Unofficial Committee's members would be reimbursed for their agreement to pay counsel in what was essentially a contingency case.  The same lack of funds could also have hampered the conduct of the anticipated chapter 11 case; the DIP financing ameliorated that risk and increased the likelihood that Mr. Marwil's efforts in pursuing estate claims would be credible.

[14] It is unlikely that such an involuntary petition would have been denied or even opposed, given that the OnShore Entities' principals were in jail.

receiver/managing member motion.  Then, in the chapter 11 case, Mr. Marwil and the

official unsecured creditors' committee successfully defeated the United States Trustee's

motion for the appointment of a chapter 11 trustee on the basis that Mr. Marwil was, in

addition to being a prepetition receiver, the Debtors' validly appointed management.  See

Adams v. Marwil (In re Bayou Group, LLC), 564 F.3d 541, 547-48 (2d Cir. 2009).[15]

The foregoing decision validates the Unofficial Committee's strategy; and

perhaps that is enough to defeat the United States Trustee's objection to its fees and

expenses related to obtaining the prepetition receiver/managing member order.  It should

also be noted, however, that, while the Committee's strategy was creative and its novelty

gave rise to material litigation costs in the chapter 11 case as a result of the United States

Trustee's reasonably anticipatable response, it also appears in practice to have

substantially benefitted the estate and the case.  The courts who denied the United States

Trustee's motion for the appointment of a trustee found Mr. Marwil to be diligently

exercising his fiduciary duties.  Id. at 547.  At least as relevant is the fact that, by

obtaining the appointment of a known quantity in Mr. Marwil (whom the Unofficial

Committee put forward only after conducting a thorough search process) and by

formulating the requested relief in the receiver/managing member motion so as to prevent

his replacement in the crucial early stages of the anticipated chapter 11 case, the

Committee ensured that a case that needed a strong central fiduciary "during a

corporation's most troubled hour," Adams v. Marwil (In re Bayou Group, L.L.C.), 363

B.R. 674, 688 (S.D.N.Y. 2007), aff'd 565 F.3d 541 (2d Cir. 2009), would have such a

person from start to finish, uninterrupted, having become better informed about the

---

[15] The United States Trustee sought Mr. Marwil's replacement by a chapter 11 trustee not because of the way Mr. Marwil was performing his duties but in the belief that, as a prepetition receiver, he was not authorized under the Bankruptcy Code to continue to serve postpetition.  Id.

OnShore Entities than any other non-insider.  That benefit significantly exceeded the cost

of litigation over the strategy's implementation, including the litigation with the United

States Trustee.

Finally, the Unofficial Committee's legal research on potential claims

clearly was conducted with an eye to the commencement of the bankruptcy case and its

implementation by an estate fiduciary.  The Committee promptly shared its research with

Mr. Marwil and his counsel under a joint privilege agreement, and it was rapidly put to

use in the chapter 11 case; indeed, the OnShore Entities filed complaints to avoid

redemptions almost simultaneously with the filing of the chapter 11 petitions.  Moreover,

these claims ultimately resulted in most of the assets comprising the estate and funding

the Debtors' confirmed chapter 11 plan:  approximately $ 81.2 million of settlements and

judgments, on which the Debtors have received approximately $ 56.5 million, another

approximately $ 24.7 million being subject to bonded appeals by "redeemers."  Under the

circumstances, the Committee's expenses were in contemplation of, and a substantial

contribution in, the case and of direct benefit to the estate, without duplication of costs

separately incurred by estate compensated professionals.[16]

In respect of all of the foregoing services, therefore, the Unofficial

Committee's prepetition activities made a substantial contribution for purposes of

Bankruptcy Code section 503(b)(3)(D).

Having established a substantial contribution, the Unofficial Committee's

Motion raises one last issue, which is whether the fees of the Committee's counsel meet

---

[16] Mr. Marwil's prepetition counsel, which subsequently became the Debtor's counsel under section 327(a) of the Bankruptcy Code, has not sought payment for unpaid prepetition fees, including fees related to Committee counsel's research on avoidable transfers, perhaps because it believed it was precluded from doing so by Bankruptcy Code section 330. See Lamie v. United States Trustee, 540 U.S. at 526.

the remaining criteria of section 503(b)(4):  that they are "reasonable . . . based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title," and that counsel's expenses be "actual and necessary."  11 U.S.C. § 503(b)(4).  These terms are similar to the terms used in Bankruptcy Code section 330 for evaluating estate-compensated professionals' fee requests, including the reference to comparable fees in non-bankruptcy matters.[17] Accordingly, with one exception, the Court's evaluation of the reasonableness of counsel fees and expenses under section 503(b)(4) should generally follow the approach used under section 330.  4 Collier on Bankruptcy ¶ 503.11[5] at 503-71.[18] The exception is that, because the professional may not know that he or she will be submitting a fee and expense request, the Court need not necessarily enforce time record requirements as strictly as with requests under section 330, id.; on the other hand, one cannot rely on a lodestar approach premised on the market-based propriety of a professional's hourly rate in relation to the hours expended if the professional does not keep meaningful time records.  In any event, the exception does not apply here, because the two firms' time and expense records are consistent with such records of counsel retained under Bankruptcy Code section 327 and compensated and reimbursed under section 330.

---

[17] See In re Cenargo Int'l., PLC, 294 B.R. 571, 595-96 (Bankr. S.D.N.Y. 2003) for a discussion of the factors to be considered under section 330 and the considerable extent of the court's discretion in determining the reasonableness of fee applications in the light of its experience with such applications and judgment pertaining to applicable billing practices.  (Indeed, bankruptcy fee applications are one of the more reliable ways for law firms to discern their competitors' billing rates.)

[18] It has been noted that section 503(b)(4) also differs from section 330 in that the inquiry under section503(b)(4) is applied in hindsight, whereas the section 330 test considers the services a reasonable lawyer would have performed knowing what he or she knew at the time.  In re Granite Partners, 213 B.R. at 447.  However this distinction really applies to whether there has been a substantial contribution.  Id.; see also In re Financial News Network, 134 B.R. at 736-37.  Once the movant has established a substantial contribution, the reasonableness of the professional's services in making that contribution should be measured by looking at what a reasonable professional would have done to achieve such a goal under the circumstances.

Here, the Committee's two law firms' time and staffing (and related billing rates) generally are reasonable in light of the work counsel was asked to do, especially when one keeps in mind the relatively novel position in which the Committee found itself -- acting on behalf of the investors in a Ponzi scheme to supplement the efforts of prosecutors -- and the urgency of the situation, which called for a high level of legal attention.  The need for speed may also have kept counsel from going off on tangents.[19]

The one exception is some unnecessary duplication of effort between the two firms.  Apparently KBLT&K was originally retained as local counsel, but it was soon performing a more substantive role than local counsel usually performs, without a corresponding decrease in K&L Gates' role.  It is impossible to determine which firm was responsible for this; most likely, both firms were equally responsible.  Therefore, each firm should have its share of the requested fees reduced by $25,000 ($50,000 being the amount that a reasonable client of the two firms in this situation would obtain as a reduction in the overall bill.)  With this exception, the Motion should be granted.

## Conclusion

For the foregoing reasons,[20] the Unofficial Committee's Motion is granted to the extent set forth herein, and the Committee and its counsel, in the aggregate, are allowed an administrative expense under Bankruptcy Code section 503(b)(4) of $627,829.17.  Counsel for the Unofficial Committee should submit a proposed order consistent with this Memorandum of Decision.

---

[19] The two firms' requested expenses were reasonable and necessary.

[20] The Unofficial Committee also sought approval of the reimbursement of its counsel's fees and expenses on the alternative basis of "common fund" doctrine.  Given the Bankruptcy Code's treatment of the right to administrative expenses, including fees and costs, under section 503(b), it seems unlikely that this doctrine would apply; in any event, the Committee's alternative theory is unnecessary given the Court's ruling.

26

Dated:  White Plains, New York
       April 5, 2010

                                _/s/ Robert D. Drain_____
                                United States Bankruptcy Judge